Charlie WADE, et al.,
Plaintiffs-Appellees,

v.

Thomas HEGNER, Defendant-Appellant.

No. 85–2859.

United States Court of Appeals,
Seventh Circuit.

Argued April 18, 1986.
Decided Oct. 20, 1986.

John B. Murphey, Ancel, Glick, Diamond, Murphy & Cope, P.C., Chicago, Ill., for defendant-appellant.

F. Thomas Hecht, Marilyn J. Klawiter, Hopkins & Miller, Chicago, Ill., for plaintiffs-appellees.

Before CUMMINGS and EASTER-BROOK, Circuit Judges, and NOLAND, Chief District Court Judge.*

* The Honorable James E. Noland, Chief Judge of the United States District Court for the Southern District of Indiana, is sitting by designation.

CUMMINGS, Circuit Judge.

Charlie Wade filed this civil rights action in April of 1983. Wade brought the suit for himself and on behalf of his six children, alleging that in 1980 they were denied admission to a Cicero public school because of race. After initial discovery, the parties moved for summary judgment on the merits. One of the defendants, Thomas Hegner,[1] also argued that he was entitled to qualified immunity. On September 24, 1985, the district court denied the parties' cross-motions for summary judgment and denied Hegner's bid for qualified immunity, concluding that the legal doctrine which prohibited excluding children from public schools on the basis of race was well established in 1980. Defendant Hegner appeals only from the district court's decision not to grant him immunity. He is the sole appellant. We have jurisdiction under 28 U.S.C. § 1292(a). See *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411; *Lojuk v. Johnson*, 770 F.2d 619 (7th Cir.1985).

## I. Facts

Charlie Wade is a skilled horse groom who moved to Sportsman's Park Racetrack in Cicero, Illinois, with his family in the fall of 1980. Sportsman's Park is a recreational horse-racing track; it provides residential quarters for its horse-care workers. The Wades are black United States citizens.

Defendant Thomas Hegner is a lifelong resident of Cicero and was the principal of Drexel Elementary School in the fall of 1980. Hegner is white. Drexel School is located in school district No. 99, and is the elementary school serving children who live at Sportsman's Park. Only white children attended Drexel or any Cicero school in 1980.

In the early fall of 1980, Hegner reassured a white parent that there were no black students at Drexel. Apprehensive that some black parents might attempt to enroll their children, Hegner sought the advice of Edward Aksamit, his predecessor. Aksamit told Hegner what he had once done when a black family had requested enrollment of their children at Drexel. He described to them racial hatreds prevalent in the Cicero community, whereupon they took their children to Hearst Elementary School, a predominantly black Chicago school.

In October 1980 Wade went to Drexel school to enroll his children. He was met by Hegner who immediately said, "It won't work." He then described the hostility that the community felt toward enrolling black children in Cicero schools. Hegner said that he could not protect Wade's children from the dangers of violence—in school or out. Wade testified that Hegner explained to him, "[I]f I wanted to enroll them he would have to accept them but he prefer [sic] that I didn't enroll them and recommend [sic] that I didn't enroll them for safety, for fear of their safety." Hegner's preference and recommendation were that Wade take the children to another school although he would enroll the children if Wade insisted. Hegner then took out a school directory and gave Wade several names of alternative schools. He sent Wade on his way without taking any information from him (such as the children's names or ages) nor did he offer Wade any assistance in dealing with the negative and hostile community reaction.

Not too surprisingly, Wade heeded Hegner's recommendation and enrolled his children the following day at Hearst School in Chicago. According to Wade,

[The children were enrolled] after I begged them [the Hearst officials] to let my children go to [Hearst] school and explained to them what was said at the other school [Drexel]. (Pls' Br. 8).

Several weeks later the children were instructed to enroll in Drexel, the appropriate Cicero school, because their enrollment violated the Illinois School Code (they were attending a school outside their own dis-

1. The other defendants were Cicero, Illinois, the Board of Education of its School District No. 99, the National Jockey Club, David Hooper, Charles Bidwell, and Roy Carey.

trict). Social workers whom Wade had contacted for help met with Hegner to arrange the children's transfer. Hegner continued to warn of violence and state his opposition to the enrollment of the Wade children at Drexel. The children eventually began attending Drexel shortly before Thanksgiving.

That attendance, however, was brief. The community was indeed outraged by the short-lived desegregation. As a result the Wades were forced to leave town in only a few days. Hegner and Drexel School were informed of the Wade family's departure and prepared out-of-the school transfers for the children.

## II. Qualified Immunity

Defendant claims that the trial court erred three ways when it rejected his defense of qualified immunity. He asserts that the court failed to find case law holding that his conduct violated clearly established constitutional principles and improperly injected an element of subjective motivation into its analysis.[2] We affirm the district court's denial of summary judgment.

Defendant asserts that his state of mind is totally irrelevant in determining whether he is entitled to qualified immunity. He cites *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396, for the proposition that the district court improperly assumed his intent to discriminate in concluding that his conduct violated plaintiffs' constitutional rights. This argument misses the boat by a long shot.

In *Harlow*, the Supreme Court adjusted the "good faith" standard of the qualified immunity defense to create a wholly objective standard. Under the previous subjective standard immunity was not available if

the defendant "took the action with the malicious intention to cause a deprivation of constitutional rights or other injury." *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214. This subjective defense element was found incompatible with the underlying purpose of qualified immunity—that insubstantial claims should not proceed to trial—because the allegation of such intent could easily create an issue of fact for trial. To accommodate that purpose *Harlow* enunciated an objective standard that could be analyzed without the need to resolve factual issues. Under *Harlow*, government officials are subject to damages liability only if their conduct has violated "clearly established" constitutional rights of which a reasonable person would have known. 457 U.S. at 818, 102 S.Ct. at 2738. In rejecting the subjective portion of the defense the Court held that the bare allegations of a malicious intention to subvert constitutional rights would no longer be enough to force government officials to a trial. *Harlow*, 457 U.S. at 817, 102 S.Ct. at 2737. Thus when the Court "objectified" qualified immunity, it did away with a subjective analysis of whether the defendant violated constitutional rights. In so doing the Court attempted to focus on the objective reasonableness of an official's act—not to provide a "license to lawless conduct." *Id.* at 819, 102 S.Ct. at 2738.

Hegner confuses the "intent" issues in applying the *Harlow* standard.[3] Two separate intent or state of mind issues exist in this case. One is related to the offense and the other is related to the defense. For purposes of the "offense" (whether Hegner discriminated) plaintiffs' supported allegations are assumed true, including intent. Once those allegations demonstrate a constitutional violation, the issue of intent is

---

**2.** Defendant also complains that the district court overlooked crucial facts when it determined that a constitutional violation occurred. We cannot reach this issue because our review on this interlocutory appeal is limited to pure questions of law. *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 2816 & n. 9, 86 L.Ed.2d 411.

**3.** Defendant also mistakenly argues that intent is not part of "conduct" or the "facts" ("the law is not clearly established that the *conduct* at issue in this case * * * would amount to exclusion violative of equal protection" (Pls' Br. 29)). Hegner's state of mind is a question of fact to be resolved at trial, but for purposes of the qualified immunity analysis it is an assumed element of conduct.

put aside. Then the "defense" (qualified immunity) is analyzed without any reference to intent, as mandated by *Harlow.* Intent is relevant to the threshold question of whether the defendant violated plaintiffs' constitutional rights but is ignored for a question of whether that right was "clearly established" at the time of the incident. Under *Harlow* and its progeny, what the district court is not permitted to do is consider whether Hegner intended to deprive the Wades of their constitutional rights irrespective of whether those rights were clearly established at the time. Accord *Kenyatta v. Moore,* 744 F.2d 1179 (5th Cir.1984); Note, *Qualified Immunity for Government Officials: The Problem of Unconstitutional Purpose in Civil Rights Litigation,* 95 Yale L.J. 126, 135–143 (1986). Otherwise an official could be granted immunity as a matter of law even though the official's motivating intent remained unresolved.

Thus under *Harlow* the district court must conduct a two-part analysis: (1) Does the alleged conduct set out a constitutional violation? and (2) Were the constitutional standards clearly established at the time in question? See *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411; *Lojuk v. Johnson,* 770 F.2d 619 (7th Cir. 1984). But appellate review of a denial of summary judgment on the issue of qualified immunity is limited to the legal question of whether the law was well established at the time of the conduct. *Mitchell,* 105 S.Ct. at 2816. Intent is relevant to (1) but not to (2). Appellate courts are to be concerned only with whether the official's alleged conduct violated a clearly established constitutional right. However, the district court properly considered evidence of Hegner's racial animus and his intent to discriminate against the Wades because they are black when deciding whether a constitutional violation occurred. And we are to assume for purposes of review that Hegner violated plaintiffs' constitutional rights. Our task is to reexamine the law in light of plaintiffs' allegations and supporting evidence to decide if the constitutional

violation was "clearly established" at the time the incidents occurred.

A summary of plaintiff's version of the facts follows: Hegner was prepared to head off black enrollment after discussing the problem with Aksamit, his predecessor. Aksamit suggested that Hegner try a tactic Aksamit once used successfully—describe to families of black applicants to Cicero schools the hostility of the Cicero community, emphasizing concern for the children's safety. One week later Hegner followed that suggestion when Wade entered his office to enroll his three children at Drexel School. Hegner's first words were, "It won't work." According to Wade, Hegner went on to explain the possible violent reaction of the community, claiming that he would not be able to guarantee the children's safety. Hegner continued by telling Wade that he preferred and recommended that Wade not send his children to Drexel, although he would have to enroll them if Wade insisted. Hegner then took out a directory and pointed out alternative Chicago schools that would be more accepting of black children. Hegner continued to warn of violence and express his opposition to enrollment when the children transferred to Drexel a few months later.

Hegner contends that it was not clearly established in 1980 that a school principal who warns potential black students of community hostility would violate their constitutional rights. He asserts that plaintiffs' facts establish only that he described the true situation as it existed in Cicero, he was willing to enroll the children, and he left the decision up to Wade; it was Wade's choice not to enroll the children. Because he did not "block" the enrollment of the Wade children, he contends there was no constitutional violation. We disagree. Wade's assertion is that Hegner's remarks were thinly veiled threats. Hegner simply fails to recognize that the district court properly accepted the plaintiffs' version of the facts for purposes of summary judgment.

Plaintiffs' allegations set forth a clear and unambiguous case of racial discrimina-

tion in violation of the Fourteenth Amendment. The right not to be denied, discouraged, or intimidated from admission to public school because of race was well established in 1980. *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; *Cooper v. Aaron,* 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5; *Green v. County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716. Plaintiffs' allegations establish the intent to discriminate, the acts of discrimination, and the result of discrimination. Hegner's intent to discriminate is shown by his pre-enrollment discussion with Aksamit, his emphasis on the expected violence in the hopes of frightening off Wade with fears of violence to his children, his unwillingness to offer assistance to overcome the prejudice, his statements that he recommended and preferred that the children not attend Drexel, and his suggestion of alternative predominantly black Chicago schools.

The district court properly concluded that it would be unreasonable for Hegner not to realize that it was "unconstitutional to intentionally discourage a black parent from registering his children by threatening the parent with the possible dangers that might ensue." (Pls' App. A 14). In response defendant contends that the law was not clearly established because "none of the cases cited by the trial court or Wade is 'closely analogous' to the fact pattern here." (Defendant's Br. 19).

Defendant asserts that he is entitled to immunity because there is no case that holds precisely that a principal who warns a black parent of possible racial unrest in the community and responds to questions about alternative schools, but who informs the parent that she or he has the right to enroll the children at the all-white school, has violated the Fourteenth Amendment. But the objective standard of *Harlow* does not require such factual specificity. *Harlow's* objective inquiry instead focuses on whether the legal norms governing such behavior were clearly established at the time of the challenged actions. *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411.

The constitutional right not to be denied admission to a public school because of race has been unquestioned for over thirty years. *Brown v. Board of Education* (*Brown I*), 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; see also Ill.Rev.Stat. ch. 12, § 10–22.5 (provision prohibiting exclusion from schools because of race added in 1945). The Supreme Court's *Brown I* decision was met with massive resistance. State and local governments engaged in a myriad of tactics to avoid desegregation of public schools, including inaction, outright defiance by political leaders, vigorous defensive legislation, and threats of violence. See generally D. Bell, *Race, Racism and American Law* ch. 9B (1973); II T. Emerson, D. Haber, N. Dorsen, *Political and Civil Rights in the United States* ch. XV(B) (1967). In 1964 the Supreme Court declared its impatience; the time to desegregate had run out. *Griffin v. Prince Edward County Bd. of Educ.,* 377 U.S. 218, 234, 84 S.Ct. 1226, 1234, 12 L.Ed.2d 256; see also *Alexander v. Holmes County Bd. of Educ.,* 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed.2d 19 (*per curiam*). Throughout the onslaught of school desegregation cases the Supreme Court has expressed its impatience with even the less blatant attempts to perpetuate racial segregation. See *Cooper v. Aaron,* 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5; *Goss v. Board of Education,* 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632; *Rogers v. Paul,* 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265; *Monroe v. Board of Cmrs.,* 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733.

The Supreme Court has addressed the issue of the impact of potential violence on desegregation duties and declared that the rights of black children are not to be sacrificed to violence and disorder. *Cooper v. Aaron,* 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5. The Court held that *Brown I* could not be nullified either openly and directly or "indirectly * * * through evasive schemes for segregation whether attempted ingeniously or ingenuously." *Id.* at 17, 78 S.Ct. at 1409. "Deep emotions have no doubt been stirred. They will not be calmed by

letting violence loose * * * or by submitting to it under whatever guise employed." *Id.* at 25, 78 S.Ct. at 1413 (Frankfurter, J., concurring). After *Cooper*, even a principal's sincere concern for the safety of minority students due to outside racial animus could not be the premise for continuing a policy of race segregation. See *Gautreaux v. Chicago Housing Authority*, 296 F.Supp 907, 914 (N.D.Ill.1969) (policy of racial segregation "cannot be justified by the good intentions with which other laudable goals are pursued").

The Supreme Court also recognized that indirect coercive pressure could be used by school authorities who officially opened school doors to blacks, but unofficially would not allow even their feet in the door. "The fact that in 1965 the Board opened the doors of the former 'white' school to Negro children and of the 'Negro' school to white children merely begins, not ends, our inquiry. * * *" *Green v. County School Bd.*, 391 U.S. 430, 437, 88 S.Ct. 1689, 1693, 20 L.Ed.2d 716. In 1968 in *Green*, the Court invalidated a freedom-of-choice plan that permitted students to choose their own public school. According to the Court, placing the responsibility to "choose" desegregation on the students burdened the children and their families with a responsibility *Brown II*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, had placed squarely on the school officials. *Green*, 391 U.S. at 441–442, 88 S.Ct. at 1696. The Court noted that blacks were often discouraged from electing white schools because, *inter alia*, they feared retaliation. *Id.* at 440 n. 5, 88 S.Ct. at 1695 n. 5. In ruling the freedom-of-choice plan invalid, the Court stated that at "this" late date (11 years after *Brown I*) the deliberate perpetuation of the unconstitutional dual system "was totally unacceptable. The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work now." *Id.* at 438–439, 88 S.Ct. at 1694.

The Supreme Court's relevant decisions of the past three decades assert and reassert that no tactics designed to perpetuate policies of racial segregation will be tolerated, no matter how subtle or solicitous of students' (black and white) welfare. *Rogers v. Paul*, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265 (grade-a-year plans); *Goss v. Board of Educ.*, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (voluntary transfer plan). More than twenty years ago the Supreme Court expressed impatience for what it considered to be intolerable delays in the face of its clear and unambiguous decisions. It is inconceivable that fifteen years later a school official could express surprise that frightening a black family out of the all-white Cicero school system would violate its constitutional rights. Therefore the district court's denial of Hegner's motion for summary judgment based on qualified immunity is affirmed.[4]

---

4. Plaintiffs' December 6, 1985, motion to supplement the record is granted.