**John AURIEMMA, Daniel Coll, Marshall Consadine, Renaldo Cozzi, Kenneth Curin, Russell Ditusa, Thomas Faragoi, Lawrence Forberg, John Hinchy, Kathryn Kajari, George Marcin, Patrick McDonough, Walter Murphy, John Rafter, Dominic Rizzi, James Stampnick, Thomas Walton and Roger Whalen, Plaintiffs–Appellees,**

v.

**Fred RICE, Defendant–Appellant,**

and

**City of Chicago, Defendant.**

No. 89–1479.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 11, 1989.

Decided Feb. 6, 1990.

As Amended March 6, 1990.

John L. Gubbins (argued), Gubbins & Associates, Chicago, Ill., for plaintiffs-appellees.

Judson H. Miner, Corp. Counsel, Frederick S. Rhine, and Phillip H. Snelling, Asst. Corp. Counsel, James D. Montgomery, Corp. Counsel, Office of the Corporation Counsel, Langdon D. Neal, Earl L. Neal & Associates, Matthew J. Piers, Gessler, Flynn, Laswell, Fleischmann, Hughes & Socol, Chicago, Ill., Ruth Moskovitch, for defendant-appellant.

Before BAUER, Chief Judge, WOOD, Jr. and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

This case was brought by eighteen white police officers of the Chicago Police Department who claim they were demoted based on race in violation of the equal protection clause of the fourteenth amendment, and 42 U.S.C. §§ 1981, 1983, and 1985(3), by defendant Fred Rice, former Superintendent of the Chicago Police Department. Rice filed a motion for summary judgment based on qualified immunity which was granted with regard to plaintiffs' claims alleging political discrimination and retaliation (for actions taken before June 11, 1984). However, Rice's motion was denied by the district court with regard to the plaintiffs' counts alleging race discrimination, conspiracy to violate civil rights, and retaliation in violation of the

first amendment (for actions taken after June 11, 1984). For the reasons set out below, we reverse the district court's partial denial of summary judgment and enter summary judgment based on qualified immunity for the counts of race discrimination and conspiracy to violate plaintiffs' civil rights. We also dismiss plaintiffs' claim of retaliation in violation of their first amendment rights for failure to state a claim.

## I.

Fred Rice was appointed Superintendent of the Chicago Police Department by the late Mayor Harold Washington in August 1983. On December 2, 1983, Rice reorganized the top management ("exempt rank") positions of the police department as is customarily done by incoming superintendents.[1] As part of the reorganization, Rice reassigned or demoted twenty-five white officers from the exempt ranks, demoted no black officers and promoted thirteen black officers to the exempt ranks.

Plaintiffs filed a five-count complaint in the District Court for the Northern District of Illinois. In Count I, the plaintiffs alleged the demotions violated their rights to due process of law as guaranteed by the fourteenth amendment. Plaintiffs subsequently dismissed this claim voluntarily. Count II of the Second Amended Complaint alleged that the plaintiffs were demoted for "political reasons." The district court granted summary judgment on this claim finding that Rice was entitled to qualified immunity because "it's not a constitutional violation to make employment decisions based upon political affiliations when party affiliation is an appropriate requirement for effective performance of the public office involved." In Count III, plaintiffs claim that race was "a substantial or motivating factor" in Rice's decision to demote them. Plaintiffs contend that the demotions of the white officers and promotions of the black officers were carried out pursuant to a plan adopted by Rice based on the officers' race. Rice denies that he made his personnel decisions based on race claiming instead that all his decisions were made to bring into the exempt ranks people that embraced his philosophy and accepted his management style. The district court denied summary judgment on this count finding that "it was clearly established that a public official could not use race for making employment determinations in the positions that then Superintendent Rice made, and so, ... qualified immunity at this stage will be denied." In Count IV, plaintiffs allege that Rice engaged in a conspiracy to violate their civil rights in violation of 42 U.S.C. § 1985(3). The district court denied Rice qualified immunity on this count holding that "the law was clear in 1983 that all racial discrimination ... was clearly covered by Section 1985(3)...." The plaintiffs' final claim, asserted in Count V, concerns the "harass[ment] and retaliat[ion] against police officers who have filed federal lawsuits against" Rice in violation of 42 U.S.C. § 1983. On this count, the district judge granted summary judgment on the basis of qualified immunity for Rice's acts up to and including June 11, 1984, when this Court denied rehearing *en banc* in *Altman v. Hurst*, 734 F.2d 1240 (7th Cir.1984), *cert. denied*, 469 U.S. 982, 105 S.Ct. 385, 83 L.Ed.2d 320 (1984). Accordingly, Rice's motion for qualified immunity on Count V was denied for all actions after June 11, 1984, "when it was clearly established [by *Altman*] that retaliation for the filing of a civil lawsuit dealing with a matter of public concern was conduct protected by the First Amendment to the Constitution." Rice appeals the denial of qualified immunity on plaintiffs' counts of race discrimination, conspiracy to violate civil rights, and retaliation (for activities after June 11, 1984) in violation of the first amendment.

## II.

The sole issue on appeal is whether Rice is entitled to summary judgment based on

---

**1.** The exempt rank officers are the highest level managers of the Chicago police department. They create and execute police policy in the supervision and direction of over 15,000 police employees.

qualified immunity. Summary judgment is the proper stage at which to resolve a qualified immunity issue because it best protects "government officials from the costs of trial and burdens of discovery, whenever possible." *Rakovich v. Wade,* 850 F.2d 1180, 1205 (7th Cir.1988) *(en banc )*; *see also Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "Under the doctrine of qualified immunity, public officials performing discretionary functions are protected against suits for damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Doe v. Bobbitt,* 881 F.2d 510 (7th Cir.1989) (citing *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738). Thus, "[t]he general rule of qualified immunity is intended to provide government officials with the ability to 'reasonably anticipate when their conduct may give rise to liability for damages.'" *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (quoting *Davis v. Scherer,* 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1983)). Correspondingly, the inherent intent of qualified immunity is to protect government officials from nonmeritorious lawsuits.

In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court enunciated the modern standard to be applied in qualified immunity cases. The Court held that the official's entitlement to qualified immunity "focuses on the objective legal reasonableness of an official's acts." *Harlow,* 457 U.S. at 819, 102 S.Ct. at 2739. "In *Harlow,* the Supreme Court eliminated the subjective good faith element from the qualified immunity analysis and held that 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Polenz v. Parrott,* 883 F.2d 551, 554 (7th Cir.1989) (quoting *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738). This Court has also stated in *Rakovich* that "under *Harlow,* an objective immunity analysis at the summary judg-

ment stage prior to discovery does not include an evaluation of intent. This is because evaluating intent would be a factual analysis, whereas the objective inquiry is a legal question." *Rakovich,* 850 F.2d at 1210. Such an interpretation is consistent with *Harlow's* approval of deciding qualified immunity cases at summary judgment because "[a]n objective analysis is less fact bound than a subjective analysis, making summary judgment a practical and effective means of terminating unnecessary litigation." *Id.,* at 1205. "Thus ... a qualified immunity analysis entails a purely objective inquiry to determine whether at the time of the alleged illegal act, the right asserted by the plaintiff was clearly established in the particular factual context presented." *Polenz,* 883 F.2d at 554 (citing *Cleveland–Purdue v. Brutsche,* 881 F.2d 427 (7th Cir.1989). It is with such an objective approach in mind that we review this case.

In light of *Harlow,* however, we note that a court's inquiry in applying an objective analysis to a claim that depends on the official's state of mind has not been fully explored by the Supreme Court. *See Benson v. Allphin,* 786 F.2d 268, 276 n. 19 (7th Cir.1986). This case presents such a dilemma, since alleged racial discrimination, violation of civil rights, and retaliation all inherently involve the intent of an official to discriminate. However, this Court has developed an analysis for the proper inquiry to be undertaken. In considering the proper approach in the face of the lack of guidance by the Supreme Court we have warned that:

> [i]t is a mistake to read *Harlow* too broadly. The elimination of intent from the formula does not mean that the *Harlow* Court sought to limit civil rights actions to those where state of mind was *not* a part of the substantive law.... *Harlow* merely states that intent must not be *evaluated or weighed* through a factual inquiry, which would reduce the likelihood that qualified immunity could be decided in a motion for summary judgment.

*Rakovich*, 850 F.2d at 1210 (citations omitted). Therefore, despite the apparent paradox, an objective analysis is applicable to situations involving a public official's state of mind. The objective determination in these cases merely requires courts to not consider intent when making the final determination at summary judgment of whether the law is clearly established.

■ We are further guided in correctly applying the objective standard to this case by the approach taken by this Court in *Wade v. Hegner*, 804 F.2d 67 (7th Cir.1986). In *Wade*, we held that *Harlow* calls for the district court to conduct a two-part analysis when state of mind is at issue: "(1) Does the alleged conduct set out a constitutional violation? and (2) were the constitutional standards clearly established at the time in question? ... Intent is relevant to (1) but not to (2)." *Wade*, 804 F.2d at 70. Thus, when intent is crucial to a party's claim, the court's consideration of intent is relevant to the determination of whether a constitutional violation exists, but not in deciding if the constitutional standard was clearly established. In fact, we stated in *Polenz* that

> where a particular state of mind (e.g., intent, discriminatory motive, retaliatory motive) is an element of the alleged constitutional violation, and the qualified immunity issue arises at the summary judgment or directed verdict stage, in order to answer the step one inquiry, the court must determine whether the plaintiff has factually supported the allegations as to the state of mind element. We made clear, however, that the defendant's subjective state of mind is not relevant to the determination of question two.

*Polenz*, 883 F.2d at 554 (footnotes omitted). Therefore, this Circuit has addressed and clarified the ambiguities in the qualified immunity analysis, i.e., "[t]he defendant's subjective good or bad faith is not part of the inquiry." *Id.* at 554 n. 3. Having thus examined the relevant legal principles, we now consider Rice's claim to qualified immunity under each of the remaining counts.

## III.

■ We begin by considering Rice's entitlement to qualified immunity under the plaintiffs' race discrimination claim. Plaintiffs assert, and the district court seemingly found, that intent is a crucial aspect of the entire qualified immunity inquiry. In this respect, the plaintiffs maintain that since Rice does not raise as his defense that he intended to racially balance the exempt ranks, he is precluded from relying on the state of affirmative action law to determine if a constitutional violation was clearly established. The district court apparently accepted this view of the qualified immunity inquiry since it did not consider the state of affirmative action law in determining that "it was clearly established that a public official could not use race for making employment determinations." Therefore, in reaching this decision, the trial court relied on Rice's subjective intent and declined to give adequate weight to the affirmative action aspect of the claim.

We find that such an approach is incompatible with the Supreme Court's holding in *Harlow*. In essence, *Harlow* determined that a subjective inquiry into an official's intent is incompatible with the underlying purpose of qualified immunity, i.e., the ability of government officials to "anticipate when their conduct may give rise to liability for damages." *Davis*, 468 U.S. at 195, 104 S.Ct. at 3019. In interpreting *Harlow*, this Court has found that when state of mind is at issue, a limited inquiry into intent is relevant in considering whether there is a constitutional violation but not to see if the law was clearly established. *Wade*, 804 F.2d at 70. Such a limited analysis of intent is consistent with *Harlow* because it does not defeat the official's ability to monitor his conduct.

We follow the guidance from *Wade* and review this question as we do any summary judgment appeal, i.e., we assume plaintiffs' supported allegations as true. *Rakovich*, 850 F.2d at 1210. Under this standard, we conclude that the district court correctly examined the alleged intent in determining that plaintiffs sufficiently alleged a constitutional violation based on

racial animus. We must now turn to the second step of the qualified immunity inquiry and determine whether the alleged constitutional violation was clearly established at the time of the alleged violation.

In considering whether the alleged right is clearly established, we must be careful to properly characterize with particularity the right in question. The Supreme Court in *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), defined the necessary specificity to be considered in determining the constitutional right. It emphasized that the identification of clearly established law is not to be applied in broad terms. *Anderson*, 483 U.S. at 639, 107 S.Ct. at 3038; *see also Cygnar v. City of Chicago*, 865 F.2d 827 (7th Cir. 1989). The Court determined that allowing plaintiffs to allege violations of broad rights would transform qualified immunity into a rule of pleading. The *Anderson* Court was concerned that by merely pleading a violation of an extremely abstract constitutional right plaintiffs could easily get into court. *Davis*, 468 U.S. at 195, 104 S.Ct. at 3019. "It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039. Only by defining the right in these terms will a court properly address the major concerns of *Harlow*.

Based on the Supreme Court's holding in *Anderson* and our interpretation of *Anderson* in *Polenz, Doe, Rakovich*, and *Wade*, we reject plaintiffs' characterization of the clearly established right at issue in this case. Plaintiffs assert that the demo-tion of the white officers and the promotion of the black officers were actions based on race and were violative of the equal protection clause of the Constitution. However, such a description of the clearly established right rises to the level of generalization that the Supreme Court condemned in *Anderson* [2] because the characterization does not provide a sufficient basis for a reasonable official to understand that what he is doing violates that right, a crucial aspect of *Harlow*. Instead, "the test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted." *Rakovich*, 850 F.2d at 1209 (quoting *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir.1987)). Then, once the defendant's actions are defined according to the specific facts of the case, this characterization must be compared to the body of law existing at the time of the alleged violation to determine if the particular actions violated the clearly established law. *Id.* at 1209.

We believe that the correct portrayal of the specific right alleged to have been violated involving race in this case is whether a reasonable superintendent of police could have concluded that he could take race into consideration for a limited reorganization of the exempt ranks of the police department. This description of the clearly established right bears a more accurate "relationship to the 'objective legal reasonableness' that is the touchstone of *Harlow*." *Anderson*, 483 U.S. at 639, 107 S.Ct. at 3038. It appropriately eliminates the erroneous application of intent from qualified immunity analysis as required by this Court's decisions in *Polenz, Rakovich*, and *Wade*. Therefore, under our characterization of the right we are not precluded from considering the state of affirmative action law merely because Rice lacks the subjective intent to implement an affirma-

**2.** "[T]he right to due process law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of 'clearly established law' were to be applied at this level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the

tive action plan.[3]

The refusal to consider Rice's lack of intent to racially balance and the corresponding proper consideration of the state of affirmative action law is also consistent with our recent decision in *Cygnar v. City of Chicago*, 865 F.2d 827 (7th Cir.1989). In *Cygnar*, this Court found that a City of Chicago department head charged with race discrimination for promoting whites and demoting blacks in a one-time reorganization was entitled to qualified immunity based on the state of affirmative action law even though he denied using race as a factor in his decisions. In that decision, we found that the defendant's intent was not at issue, but rather the question was whether the law put him on notice that his actions violated clearly established constitutional rights. Only by defining the right at issue in an objective manner, through the elimination of intent, can such notice be achieved. There is no reason we should not adopt an analysis similar to that of our decision in *Cygnar* today.[4]

We recognize that there may be an inherent irony to an analysis that considers the state of affirmative action law where the defendant denies he had the intent necessary to initiate an affirmative action plan. However, this is the result we must address under *Harlow* and its interpretations by this Court. As previously stated, *Harlow* requires an objective reasonableness test that does not consider the subjective intent of the defendant. Therefore, whether Rice intended to enact an affirmative action plan is not relevant. Rather, it is the objective reasonableness of Rice's ac-

tions in light of clearly established law that must be considered. *See Harlow*, 457 U.S. at 819, 102 S.Ct. at 2738.

We now turn to the question of whether such a right, in light of affirmative action law, was clearly established as of the time of the alleged violation. We look again to *Cygnar* where this Court reviewed the state of applicable affirmative action law during the same time frame. In that case, we determined that in order for a valid affirmative action plan to be implemented in 1983 there must exist: "(1) some type of statistical disparity between the local labor force and the minority composition of the employer's work force and (2) a time limit on the plan." *Cygnar*, 865 F.2d at 844 (quoting *Lehman v. Yellow Freight System, Inc.*, 651 F.2d 520 (7th Cir.1981)); *see also Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). Under this analysis, we believe that a reasonable superintendent of police could have concluded that he could consider race for a limited reorganization of the exempt ranks as this was not a clearly established constitutional violation at the time the violation is alleged to have occurred.

At the time Rice instituted his transfers, a statistical disparity existed between the exempt ranks and the total police department work force. The exempt ranks of the Chicago Police Department were 83% white, 13% black, and 4% hispanic, whereas the total department work force was 69% white, 27% black, and 4% hispanic. After the reorganization, the exempt ranks were

touchstone of *Harlow*." *Anderson*, 107 S.Ct. at 3039.

**3.** Contrary to the dissent's assertion, the majority does not "create what is in effect an affirmative action defense for Rice." Rather, *Harlow* and its interpretations in this Court, discussed more fully in the body of the opinion, mandate that we do not consider a public official's subjective intent. Because such intent is irrelevant, the state of affirmative action law becomes part of our inquiry. Therefore, our affirmative action approach is mandated by accepted principles of law.

**4.** The plaintiffs try to distinguish *Cygnar* on the ground that the district court in that case found that the defendant was actually carrying out an

affirmative action plan and cryptically testified to that effect, whereas in this case Rice vehemently denies ever considering race. This distinction is not as great as plaintiffs would have this Court believe. In *Cygnar* the defendant denied implementing an affirmative action plan, as does Rice in this case. In any event, any minimal factual distinction is irrelevant under the objective qualified immunity analysis established in *Harlow*. Under this view, Rice's intent is not dispositive of the question of whether the law was clearly established at the time and thus plaintiffs' distinction is meaningless.

71% white, 24% black and 4% hispanic.[5] Additionally, the reorganization was a one-time restructuring, thereby satisfying the time limit requirement of *Lehman.* Thus, since Rice's actions meet the *Lehman* requirements that defined affirmative action law in this Court as of 1983, we believe that at that time it was not clearly established that Rice's transfers violated the plaintiffs' constitutional rights. As such, Rice is entitled to qualified immunity on plaintiffs' racial discrimination claim.

## IV.

We turn next to Rice's qualified immunity defense on the plaintiffs' claim of a conspiracy to violate their civil rights under 42 U.S.C. § 1985(3). Rice contends, and we agree, that he is entitled to qualified immunity on this claim as well.

In analyzing this claim, we must apply the same *Harlow* qualified immunity analysis as previously discussed. Accordingly, we accept the allegations of the pleadings as true and turn our attention to whether it was clearly established at the time of the alleged violation that a reasonable superintendent of police could not consider race for a limited reorganization of the exempt ranks of the police department. Such a characterization properly defines the right at issue under the *Harlow* and *Anderson* approaches. We must next examine the relevant case law to resolve whether the right was clearly established. This necessarily includes a determination of whether racially motivated conspiracies against whites are covered under § 1985(3). If it was not clearly established that whites as a class were within the purview of § 1985(3) in 1983, then there is no clearly established constitutional violation.

In denying qualified immunity to Rice on this issue, the district court relied on the language of this Court's decision in *Grimes v. Smith,* 776 F.2d 1359, 1365 (7th Cir. 1985), where we stated that "in *Griffin* [*v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)], it was made clear that racially motivated conspiracies were prohibited under Section 1985(3)." The dis-

trict court reasoned that since § 1985(3) prevents racially motivated conspiracies, Rice's reorganization must also be prohibited. However, it does not necessarily follow from *Grimes* that *all* racial discrimination is covered by § 1985(3). Rather, *Grimes* must be read in the light of the Supreme Court's holding in *United Brotherhood of Carpenters and Joiners v. Scott,* 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983). Since *Scott* was decided in 1983, it is particularly helpful in determining whether the right was clearly established.

In *Scott,* the Court considered the application of § 1985(3) to a conspiracy by a pro-union group against a group of non-union employees. The conspiracy resulted in a physical attack on the non-union employees, who filed an action for damages under § 1985(3). In addressing these claims the Court decided that the original objective of § 1985(3) was the protection of blacks and their supporters and therefore the action was not proper under § 1985(3). The *Scott* Court, by not recognizing conspiracies motivated by economic or commercial animus, limited the scope of § 1985(3) to cases of racial animus. In its decision, the Court extensively discussed the legislative history and original intent of § 1985(3). Although the Court refused to expand § 1985(3) to actions involving non-racial animus, its discussion regarding the scope of § 1985(3) is particularly relevant in considering whether to expand § 1985(3) to non-blacks. The Court held:

> it is a close question whether § 1985(3) was intended to reach any class-based animus other than animus against Negroes and those who championed their cause, most notably Republicans. The central theme of the bill's proponents was that the [Ku Klux] Klan and others were forcibly resisting efforts to emancipate Negroes and give them equal access to political power. The predominant purpose of § 1985(3) was to combat the

---

5. Although this is not the precise test established in the first prong of *Lehman,* it is a sufficiently similar statistical analysis for a government offi-

cial to reasonably believe it could be used to foster an affirmative action plan.

prevalent animus against Negroes and their supporters.

463 U.S. at 836, 103 S.Ct. at 3360. After discussing the legislative history of § 1985(3), the Court concluded it would withhold "judgment on the question whether § 1985(3), as enacted, went any farther than its central concern—combating the violent and other efforts of the Klan and its allies to resist and to frustrate the intended effects of the Thirteenth, Fourteenth, and Fifteenth Amendments." *Id.* at 837, 103 S.Ct. at 3360. *See also Harrison v. Kvat Food Management, Inc.*, 766 F.2d 155, 161 (4th Cir.1985) (Republicans as a class are not protected by 1985(3)).

After reading *Scott*, it is far from clear whether § 1985(3) extended to protect whites as of 1983. It is well established that "[p]ublic officials are entitled to immunity unless it has been authoritatively decided that certain conduct is forbidden." *Alliance to End Repression v. City of Chicago*, 820 F.2d 873, 875 (7th Cir.1987). Because we find that the law was not clear in 1983 as to whether § 1985(3) covered whites as a class we cannot say that Rice should reasonably have known that his actions violated the plaintiffs' constitutional rights. Our recent opinion in *Triad Associates, Inc. v. Chicago Housing Authority*, 892 F.2d 583 (7th Cir.1989), does not mandate a different result. In *Triad*, we expressly determined for the first time that § 1985(3) should extend beyond its "predominant purpose" and cover conspiracies against whites. This decision fully comports with our holding today, since we do not reach the merits of this claim but merely determine that as of 1983 it was not clearly established that § 1985(3) extended to whites. In fact, *Triad* recognized that the merits of this claim have "not been affirmatively ruled upon by *any* court to date." *Triad*, 892 F.2d at 592 (emphasis added). Since *Triad* is the first decision by any court to precisely address the issue, we are confident in holding that it was not clearly established in 1983 that § 1985(3) extended to whites. In any event, based on *Scott*, the plaintiffs have not met their burden of establishing that the right was clearly established. *See Abel v. Miller*, 824 F.2d 1522, 1534 (7th Cir.1987). Therefore, Rice is entitled to qualified immunity on this claim.

## V.

■ Turning to Rice's final claim, we review the district court's partial denial of qualified immunity on plaintiffs' cause of action based on an alleged "pattern of harassment and retaliatory treatment by defendant[ ] Rice" since the filing of their complaint. Specifically, plaintiffs allege that Rice engaged in conduct that consisted of retaliatory transfers and a failure to consider them for promotion in violation of their first amendment right to freedom of speech in protecting their right to file this suit. The district court granted summary judgment on the basis of qualified immunity for all acts which occurred on or before June 11, 1984, the date this Court denied rehearing in *Altman v. Hurst*, 734 F.2d 1240 (7th Cir.), *cert. denied*, 469 U.S. 982, 105 S.Ct. 385, 83 L.Ed.2d 320 (1984). In *Altman*, a police sergeant was reassigned to a less-desirable post after the police chief suspected that the sergeant encouraged another officer to appeal her suspension from the force. After the sergeant filed his complaint, a campaign of harassment was instituted against him. We held that the filing of the sergeant's suit and subsequent retaliation by the police chief were not in violation of plaintiff's first amendment rights because the speech concerned a private matter rather than issues of public concern. *Altman*, 734 F.2d at 1243–44.

The district court, in this case, determined that *Altman* clearly established that a lawsuit raising a matter of public concern was speech protected by the first amendment and entitled to protection under § 1985(3). Further findings by the district court determined plaintiffs' suit in this case inherently involved a matter of public concern since it involved a superintendent of police, and accordingly denied Rice qualified immunity after June 11, 1984. Rice claims he is entitled to qualified immunity for acts alleged to have occurred after June 11, 1984, as well, since he alleges that

in 1984–1985 it was not clearly established that the first amendment prohibited retaliation for filing a civil rights lawsuit.

In considering this issue the trial court found that there were no cases in 1983 clearly articulating that the mere filing of a lawsuit was an action protected by the first amendment; in fact, the trial court found the case law was to the contrary. The district court concluded the only time a filing of a lawsuit may be protected by the first amendment is when it implicates a matter of public concern. Thus, the trial court identified the threshold inquiry to determine if there was a constitutional right was whether the matter is one of a public or private concern. *See also Altman*, 734 F.2d at 1240.

The district court in the instant case reached its finding by concluding that allegations of race discrimination targeted at a Superintendent of Police of the City of Chicago are inherently matters of public concern and thus denied qualified immunity. *Id.* at 53. However, we find that such a broad analysis is inappropriate. Although it is true that such transfers may be of *interest* to the public, we find that in applying the test established by the Supreme Court in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the actions taken by Rice do not raise an issue of public *concern*. Thus, plaintiffs have failed to state a claim for retaliation and harassment in violation of their first amendment rights to file this lawsuit.[6]

The Supreme Court in *Connick* established the test to determine if an issue involves a matter of public concern. The *Connick* test does not look to what may be conveyed by the employee's speech, but rather, requires a court to look to the reasons the employee is speaking. In *Connick*, an assistant district attorney was fired for insubordination for distributing a questionnaire in the office. The Court, finding that at least one issue in the questionnaire was of public concern, nevertheless concluded the distribution of the questionnaire was essentially an act of insubordination driven by private motive. Therefore, the Court held, the speech involved was motivated solely by private interests. The Court further stated "that when a public employee speaks not as a citizen upon matters only of public concern, but instead as an employee upon matters of only personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690.

We believe that the district court's decision, in the instant case, that this was a matter of public concern, was a misapplication of the law. It does not appear from the record that the trial court took note of, or applied, the *Connick* test. Instead, the court concluded that the mere fact that this case concerns a superintendent of police makes this a matter of public concern. However, "[t]o presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case." *Connick*, 461 U.S. at 149, 103 S.Ct.

---

**6.** As the dissent properly notes in its discussion of this claim, but neglects to accept in its response to our holding regarding plaintiffs' race discrimination claim, intent of the public official is irrelevant to the qualified immunity inquiry of whether a constitutional right is clearly established. However, based on this rule of law, the dissent seeks to show an apparent inconsistency in our use of intent in considering whether this case involves a matter of public concern. The dissent misreads whose intent we are considering. Here we are looking to the intent of the plaintiffs and not the public official, only the latter is barred under qualified immunity analysis. Also, the dissent does not recognize that we do not reach the level of qualified immunity inquiry which precludes us from considering intent in qualified immunity cases. Instead, we find that plaintiffs' first amendment cause of action fails to state a claim since it does not involve a matter of public concern. The consideration of plaintiffs' intent is relevant at this level of the inquiry as determined by the Supreme Court in *Connick*.

Accordingly, because we do not reach the qualified immunity issue, we need not address Rice's claim that it was not clearly established that the first amendment protects the filing of a civil rights lawsuit.

at 1691. Nonetheless, the district court reached this result in light of *Altman* where it was determined that even though that case involved a chief of police, it was still purely a matter of personal interest.

This Court has adopted a set of questions to be considered in applying the *Connick* test. In *Linhart v. Glatfelter*, 771 F.2d 1004, 1010 (7th Cir.1985), we decided the essential questions to be considered in deciding this issue are: "was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?" *Linhart*, 771 F.2d at 1010. When answering these questions to determine whether the employee's speech addresses a matter of public concern, the content, form, and context of the statement must be determined as revealed in the whole record. *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690–91.

In *Yatvin v. Madison Metropolitan School Dist.*, 840 F.2d 412, 419–20 (7th Cir.1988), we adopted the *Linhart* inquiry and determined that the filing of a lawsuit alleging retaliation for filing a sex discrimination complaint against a school district was not activity protected by the first amendment because the filing of the suit was not a matter of public concern. The plaintiff in *Yatvin* only "wanted to advance her career, not promote a cause." *Id.* at 419. So too is it apparent in this case that the plaintiffs in filing their complaint were merely challenging their demotions and transfers rather than trying to raise an issue of public concern. They sought to advance their careers and receive compensatory and punitive damages for the alleged wrongs. It was not their central intention to promote a cause of public concern. Race discrimination is a matter of

7. The dissent maintains that since this suit was filed against "one of the nation's most important metropolitan police forces" it naturally implicates the public interest. We acknowledge that this case may interest the public, but respectfully suggest that the dissent employs the incorrect focus under the law. The critical issue is whether the suit involves a matter of public *concern*, not simply one of public *interest*. These are two significantly different inquiries.

public concern, but the plaintiffs did not seek to debate race discrimination. They were solely interested in advancing their own private employment interests.[7] *See Yatvin*, 840 F.2d at 419–20.

Although the subjective intent of the parties may be difficult for an appellate court to determine, we believe that, as was the case in *Yatvin*, this lawsuit "does not seek relief against *pervasive or systematic misconduct by a public agency or public officials*, and, ... is not part of an overall effort by the plaintiff[s] ... to correct allegedly unlawful practices or bring them to public attention." *Yatvin*, 840 F.2d at 420 (emphasis added). Therefore, we find that the district court incorrectly held that the alleged harassment and retaliation stemming from the filing of the plaintiffs' complaint was a matter of public concern. Since only lawsuits that present matters of public concern may have first amendment protection, and we have determined that this is not such a case, we find that *Connick* mandates the dismissal of plaintiffs' action for failure to state a claim. *Altman*, 734 F.2d at 1244.

## VI.

Accordingly, we hold that, Superintendent Rice is entitled to summary judgment based on qualified immunity on plaintiffs' counts of race discrimination, and conspiracy to violate their civil rights. We also find that plaintiffs have failed to state a claim on their allegations of retaliation in violation of their first amendment rights. Therefore, in accordance with this opinion, we REVERSE the district court on these counts and enter summary judgment in favor of Rice accordingly.

HARLINGTON WOOD, Jr., Circuit Judge, dissenting.

A topic that is of interest to the public may be determined, as the dissent notes, by viewing the local newspapers. However, a matter of public concern must be detected under the test established by the Supreme Court in *Connick* and its interpretations by this Court. Such an analysis requires a determination of the plaintiffs' purpose in bringing this suit, as is discussed more fully in the text.

This is not an easy case in which to administer the accepted principles of law, with which I have no disagreement, applied by the majority. It is only in the application of those principles to the facts of this case which causes me, in part, to respectfully dissent.

In Count III the eighteen white plaintiff high-ranking police officers charge that they were demoted because of race, and that black officers were advanced to positions which had previously been held by them. Former Superintendent Rice, also a black, absolutely denies his decision was based on race. Rather, he explains it was done only to advance people who embraced "his philosophy," and "accepted his management style." What that philosophy and management style may have been, or how it was determined that these plaintiffs neither embraced or accepted whatever there was to embrace or accept, is not explained. Ability to perform as police officers clearly appears not to have been a factor as Rice stated he had no reason to believe that the replaced plaintiffs would not have continued to do a good job.

The majority agrees, and so do I, with the decision of the district court insofar as it held that the plaintiffs sufficiently alleged a constitutional violation based on racial animus. The next step, however, the qualified immunity inquiry, is where we begin to part company. The majority correctly explains that the right alleged to have been violated must be clearly established at the time and be characterized with particularity. The contours of that right are required to be sufficiently clear to enable a reasonable official to understand that what he contemplates doing may violate that right. The majority rejects plaintiffs' characterization of the clearly established right at issue.

Plaintiffs complain that their demotions and the promotions of the substitute officers were based on race and therefore violated their equal protection rights. That is too general a charge for the majority but not for me when viewed as it must be in its factual context. As the majority recounts, Rice reorganized the top management of the Chicago Police Department. Twenty-five white officers were demoted although only eighteen of them joined as plaintiffs in this suit. Not a single black officer was demoted, but thirteen black officers and no white officers were promoted to the vacancies created by the white demotions. It seems to me that the top police officer of a large metropolitan police force, considering Rice and others similarly situated, objectively and reasonably would or should have known that what was being done would likely violate a right of the plaintiffs. High police officials are experienced to some extent in legal issues and constitutional rights. More therefore can reasonably and objectively be expected from top police officials than, for instance, from a mere supervisor in some other ordinary government office. Rice and other police superintendents ordinarily have access to legal advice within the municipality. The majority states the issue to be whether a reasonable superintendent of police could have concluded that he could take race into consideration for his reorganization. It seems to me a little more than just "taking race into consideration" when all whites are out and all blacks are in, but that states the issue fairly enough.

The majority then proceeds to create what is in effect an affirmative action defense for Rice, but he made it very plain he claimed none. He had not approached the reorganization on that basis and had done no affirmative action statistical analysis or anything else for affirmative action purposes. In fact, Rice explained that if he had injected any factors other than efficiency and effectiveness into the top command structure, he would have been doomed to failure as a superintendent. Rice not only denies that race was a factor, but offers the explanation that his reorganization only had to do with his own philosophy and style, not race or anything else. The majority, nevertheless, creates for Rice a paper-mache affirmative action defense just for the purposes of granting qualified immunity. In disagreeing with the majority's qualified immunity affirmative action approach in these circumstances I do not mean or intend to disparage affirmative action in the slightest. I fully support affirmative action appropriately applied.

To justify what it does the majority cites a number of cases which we need to examine.

*Cygnar v. City of Chicago*, 865 F.2d 827 (7th Cir.1989), is viewed by the majority as its pattern for what it does. In the present case, however, *Cygnar's* significant factual distinctions are discounted. In *Cygnar*, 865 F.2d at 844, this court held that the state of the law at about this same time did not clearly prevent that defendant from transferring those plaintiffs based upon their race to correct what the *Cygnar* defendant perceived to be a statistical under-representation of minorities in the office. Therefore, it was held that the defendant was entitled to qualified immunity as the criteria had been met, perhaps unwittingly, for a valid affirmative action plan under *Lehman v. Yellow Freight Systems, Inc.*, 651 F.2d 520 (7th Cir.1981). In *Cygnar*, 865 F.2d at 835–36, however, there was evidence to suggest such a course. A very pertinent memo had been sent to his supervisor by the defendant who had instituted the racial transfers. That memo informed his supervisor that he was assuming command of the "affirmative action posture" of his new office. Thereafter in the memo was set out an office personnel listing showing race. In view of the apparent disparity in the listing, that defendant concluded that affirmative action did not exist in the department and that something would be done about it, and it was. A follow-up memo indicated progress in correcting the racial imbalance. As this court noted in *Cygnar* that defendant also testified that he instituted the transfers not because of a discriminatory animus but to bring in people he knew and trusted.

It can, therefore, be seen that in *Cygnar* this court had something factual to go on to objectively support its view, but there is no similar factual support in this present case. A pseudo affirmative action-qualified immunity defense is manufactured only out of air. The majority supplies Rice with a statistical disparity backup which he did not have, did not use, or even want at the time. It is more than just a matter of Rice's intent, expressed or unexpressed. He offered under oath his only explanation of why he took the official actions that he did. What the majority creates in these particular circumstances, quite apart from Rice's expressed intent, which exonerates Rice without trial is for me just too contrived and artificial.

The *Harlow* objective legal reasonableness standard is the best standard that can be conceived, but I believe it is being unrealistically carried too far in the present factual circumstances. It affords a "reasonable superintendent of police," viewing the matter objectively, more protection than a reasonable superintendent of police at that time should have needed. I would therefore affirm the district court on this count although our approaches to the issue vary somewhat.

Count IV raises the issue of Rice's qualified immunity in the context of an alleged violation of plaintiffs' civil rights under 42 U.S.C. § 1985(3). The majority allows Rice qualified immunity as it is determined that at that time the law was not clear as to whether section 1985(3) covered whites as a class for qualified immunity purposes. I agree with that analysis, and therefore join that part of the opinion.

The final issue is raised by Count V of the amended complaint which alleges a pattern of harassment and retaliatory treatment by Rice, specifically that he subjected some of the plaintiffs to retaliatory transfers and denial of consideration for promotion in violation of their first amendment rights to freedom of speech in protecting their right to file this very civil rights suit. The district court granted summary judgment on the basis of qualified immunity for acts prior to but denied it after the date of our decision in *Altman v. Hurst*, 734 F.2d 1240 (7th Cir.), *cert. denied*, 469 U.S. 982, 105 S.Ct. 385, 83 L.Ed.2d 320 (1984). *Altman* established that retaliation for filing a civil law suit dealing with a matter of public concern was conduct protected by the first amendment. *Altman* involved a suit by a single police sergeant complaining about an undesirable reassignment. The sergeant also alleged that he was harassed for encouraging another officer to appeal her suspension from the force. This court held defendant's actions not to be a first amendment violation because plaintiff's speech was

only a private internal matter and not a matter of public concern.

I agree with the *Altman* holding, but the present case is much more than that. The majority finds no public interest based in part on *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). *Connick* involved a single public employee who distributed a questionnaire within his own office. That was considered by his supervisor as insubordination motivated only for a private motive, except with a limited exception, and therefore not protected.

I do not find in *Connick* that the Supreme Court directs us to look only to the reasons the employee spoke out to determine whether there is a matter of public concern or not. *Connick* holds that the employer need not tolerate the employee's insubordination, disruption of the office, and destruction of working relationships. *Id.* at 152, 103 S.Ct. at 1692. There was no disruption or destruction by the plaintiffs in the present case. No fault was found with them. Also in *Connick* the manner, time, place, and context are found relevant and significant. In *Connick* the plaintiff was transferred based on internal matters, then plaintiff's suit followed. In the present case the alleged retaliation followed from plaintiffs banding together to bring the acts of the superintendent to the attention of the federal court. *Connick* found that the circulated and disruptive interoffice questionnaire touched in part on a matter of public concern because of a single question, among many other irrelevant questions, that inquired about political pressure in their jobs. *Id.* at 149, 103 S.Ct. at 1691. That *Connick* finding is reached without any finding that the employee's reason for circulating the questionnaire which contained that one question was only for a public and not a private concern. The

Court held it "apparent" that the issue was a matter of interest to the community. *Id.* at 149, 103 S.Ct. at 1691. In this present case, the majority finds no public interest merely because it finds it was not the central intention of plaintiffs to promote a cause of public concern. Plaintiffs, it is assumed, were only concerned with their own private employment interests. This present case is much more than the *Connick* questionnaires one political question held to be of public concern.

Rice's "intent" in the qualified immunity context is quite properly immaterial, but on the other hand the personal intent of plaintiffs in this context is found by the majority to be the only controlling factor. It is, of course, obvious that plaintiffs have a personal financial interest in this law suit. These white officers held ranks and positions noted by the majority to be "the highest level managers of the Chicago police department, and who helped create and execute police policy in the supervision and direction of over 15,000 police employees." Nevertheless, the majority does not find enough to interest the public in what was done allegedly because this suit had been filed challenging the demotions and promotions for reasons other than merit at the highest level of one of the nation's most important metropolitan police forces. If the public was not concerned about this type of police reshuffling and the alleged retaliation which could impact for better or worse on its safety and welfare, then it should have been, but I think the public was interested.[1]

The majority also cites *Linhart v. Glatfelter*, 771 F.2d 1004, 1010 (7th Cir.1985), as support for its view, but that is only a case of a disgruntled acting chief of police who tried to maneuver his appointment as the permanent chief. Instead of the appointment he received only a letter of reprimand for his personnel file. I agree with that

---

1. It seems, however, that others viewed the police reshuffling as a matter of considerable public interest. When it happened it was a front page story in the *Chicago Tribune* on December 3, 1983. It was reported in a two-page article that the police "department's top commanders got new jobs Friday from Superintendent Fred Rice in the biggest department shake-up in recent history." One of the plaintiffs, Larry For-

berg, Commander of the Narcotics Section, is quoted as speaking out strongly against his demotion and transfer. He recited the awards he had been given for his narcotics work by the federal government. Even before it happened it made news in the *Chicago Tribune* as something sources said was about to happen. There was a photograph of Rice. *Chicago Tribune*, Dec. 2, 1983, § 3, at 1, 3. It is not surprising that this

decision, but it is likewise of little guidance when contrasted with the present factual circumstances. *Yatvin v. Madison Metropolitan School District*, 840 F.2d 412 (7th Cir.1988), is also cited by the majority. It is likewise a decision I find no fault with, but again it is so factually distinguishable as to be of little help. *Yatvin* involved the principal of a public school who complained about the denial of two promotions she had sought. She claimed that she lost the first promotion because of her sex and that she lost the second promotion in retaliation for her filing a sex discrimination charge after losing the first promotion. These facts were found not to raise a matter of public concern because, in essence, *Yatvin* made no attempt "to distinguish this case from the run-of-the-mine [*sic*] single-plaintiff discrimination case." 840 F.2d at 420. That situation, however, is far from the present case where a large number of high-ranking white police officers with important public responsibilities were demoted and replaced by black officers, and then were allegedly harassed for filing this federal civil rights suit. There is public significance in this present case because it involves a most important public agency and very sensitive and significant racial changes which could affect the public generally. This case is of much greater public significance than the cases the majority uses as precedents to dispose of it.

I do not intend to suggest any opinion whatsoever about plaintiffs' allegations on their merits. My view is only that I do not believe that Counts III and V are ready for summary judgment on the basis of the qualified immunity of Rice, or dismissal for failure to state a claim because of the majority's determination that it is not a matter of public concern. The last thing I would suggest is that the federal court just second-guess public officials in the way they administer their offices. Qualified immunity for public officials is an absolutely essential protection for them, but in the way the majority applies it here in Count III it could become more than a shield to protect public officials from the disruption of trials. It could become a shield for the

activities of public officials for which they should reasonably have anticipated being later held to answer. As I read *Connick* in regard to Count V it supports plaintiffs. This present case is more than a reflection of "one employee's dissatisfaction with a transfer and an attempt to turn that displeasure into a cause celebre," much more. 461 U.S. at 148, 103 S.Ct. at 1691. Count V does not deserve to be dismissed.

I would prefer to affirm the district court on Counts III and V, and so to that extent I respectfully dissent.

police shake-up got public attention from the beginning.