910 F.2d 1449
 53 Fair Empl.Prac.Cas. 1276,
54 Empl. Prac. Dec. P 40,154, 59 USLW 2160,
5 Indiv.Empl.Rts.Cas. 1758
 John AURIEMMA, Daniel Coll, Marshall Consadine, Renaldo
Cozzi, Kenneth Curin, Russell Ditusa, Thomas Faragoi,
Lawrence Forberg, John Hinchy, Kathryn Kajari, George
Marcin, Patrick McDonough, Walter Murphy, John Rafter,
Dominic Rizzi, James Stampnick, Thomas Walton, and Roger
Whalen, Plaintiffs-Appellees,
v.
Fred RICE, Defendant-Appellant,
and
City of Chicago, Defendant.
 No. 89-1479.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 11, 1989.
Reargued En Banc May 30, 1990.
Decided Aug. 20, 1990.
 
 John L. Gubbins, Gubbins & Associates, Chicago, Ill., for plaintiffs-appellees.
 Judson H. Miner, Office of the Corp. Counsel, Ruth M. Moscovitch, Asst. Corp. Counsel, Office of the Corp. Counsel, Appeals Div., Frederick S. Rhine, Asst. Corp. Counsel, James D. Montgomery, Corp. Counsel, Office of the Corp. Counsel, Matthew J. Piers, Gessler, Flynn, Fleischmann, Hughes & Socol, Phillip H. Snelling, Asst. Corp. Counsel, Office of the Corp. Counsel, Langdon D. Neal and Earl L. Neal, Neal & Associates, Chicago, Ill., for defendant-appellant.
 Before BAUER, Chief Judge, CUMMINGS, WOOD, Jr., CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION and KANNE, Circuit Judges.
 WOOD, Jr., Circuit Judge,[1] joined by CUMMINGS, POSNER, COFFEY, EASTERBROOK, RIPPLE and MANION, Circuit Judges.
 
 
 1
 This case was brought by eighteen white officers of the Chicago police department who were demoted by defendant Fred Rice, a black former superintendent of the Chicago police department. Plaintiffs claim they were demoted because of their race in violation of the equal protection clause of the fourteenth amendment and 42 U.S.C. Secs. 1981, 1983, and 1985(3).
 
 
 2
 In the original and now-vacated opinion, a divided panel relied on the doctrine of qualified immunity to reverse the district court and enter summary judgment in favor of defendant Fred Rice. See Auriemma v. Rice, 895 F.2d 338 (7th Cir.1990). Now, a divided en banc court affirms the district court denying Rice qualified immunity on counts III and V and reverses on count IV where the district court had denied him qualified immunity.
 
 I.
 
 3
 The late Mayor Harold Washington in August 1983 appointed Fred Rice superintendent of the Chicago police department. On December 2, 1983, Rice reorganized the top management ("exempt rank") positions of the police department. The exempt rank officers are the highest level managers of the Chicago police department; they create and execute police policy in the supervision and direction of over 15,000 police employees. As part of that reorganization, Rice reassigned or demoted twenty-five white officers from the exempt ranks, demoted no black officers, but promoted thirteen black officers to the exempt ranks.[2] It is argued that some reorganization is customarily expected from new superintendents, but it is not argued that it is customary to do so on this allegedly racial basis, at least in the absence of an affirmative action plan. Rice, however, absolutely denies his reorganization decision was based on race. Rather, he explains, it was done only to advance people who embodied "his philosophy" and "accepted his management style."
 
 
 4
 Plaintiffs, the victims of Rice's reorganization, followed their demotions with their five-count complaint in this case. In count I, the plaintiffs alleged the demotions violated their fourteenth amendment rights to due process of law; plaintiffs subsequently dismissed this claim voluntarily. Count II alleged that the plaintiffs were demoted for "political reasons." The district court granted summary judgment on this claim finding that Rice was entitled to qualified immunity because "it's not a constitutional violation to make employment decisions based upon political affiliations when party affiliation is an appropriate requirement for effective performance of the public office involved." This ruling has not been appealed. In count III, plaintiffs allege under 42 U.S.C. Secs. 1981 and 1983 that race was "a substantial or motivating factor" in Rice's decision to demote them in violation of the fourteenth amendment. Plaintiffs contend that the white officers' demotions and the black officers' promotions were carried out pursuant to a nonaffirmative action plan, adopted by Rice, but nonetheless based on the officers' races. The district court denied summary judgment to Rice, finding that it was clearly established that a public official making decisions similar to Rice could not use race for making employment determinations. In count IV, plaintiffs allege that Rice engaged in a conspiracy to violate their civil rights in violation of 42 U.S.C. Sec. 1985(3). The district court likewise denied Rice qualified immunity on this count, holding that "the law was clear in 1983 that all racial discrimination ... was clearly covered by Section 1985(3)...." The plaintiffs finally claim, in count V of an amended complaint, violations of their first and fourteenth amendment rights for "harass[ment] and retaliat[ion] against police officers who have filed federal lawsuits against" Rice. On this final count, the district judge granted summary judgment on the basis of qualified immunity for Rice's acts up to and including June 11, 1984, when this court denied rehearing en banc in Altman v. Hurst, 734 F.2d 1240 (7th Cir.), cert. denied, 469 U.S. 982, 105 S.Ct. 385, 83 L.Ed.2d 320 (1984). Accordingly, Rice's motion for qualified immunity on count V was denied for all actions after June 11, 1984, "when it was clearly established [by Altman ] that retaliation for the filing of a civil lawsuit dealing with a matter of public concern was conduct protected by the First Amendment to the Constitution."
 
 II.
 
 5
 The issue on appeal is whether Rice is entitled to summary judgment based on qualified immunity. Summary judgment is the proper manner to resolve a qualified immunity issue as soon as possible because it protects "government officials from the costs of trial and burdens of discovery, whenever possible...." Rakovich v. Wade, 850 F.2d 1180, 1205 (7th Cir.1988) (en banc ), cert. denied, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988); see also Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "Under the doctrine of qualified immunity, public officials performing discretionary functions are protected against suits for damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." Doe v. Bobbitt, 881 F.2d 510, 511 (7th Cir.1989) (citing Harlow, 457 U.S. at 818, 102 S.Ct. at 2738), cert. denied, --- U.S. ----, 110 S.Ct. 2560, 109 L.Ed.2d 742 (1990). Thus, "[t]he general rule of qualified immunity is intended to provide government officials with the ability 'reasonably [t]o anticipate when their conduct may give rise to liability for damages.' " Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (quoting Davis v. Scherer, 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984)). Correspondingly, the inherent purpose of qualified immunity is to protect government officials from nonmeritorious lawsuits. Were it not for the qualified immunity issue in this case, the disputed race factor in the reorganization would clearly not be appropriate for summary judgment.
 
 
 6
 In Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court enunciated the standard to be applied in qualified immunity cases. The Court held that the official's entitlement to qualified immunity "focuses on the objective legal reasonableness of an official's acts." Id. at 819, 102 S.Ct. at 2739. "In Harlow, the Supreme Court eliminated the subjective or good faith element from the qualified immunity analysis and held that 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " Polenz v. Parrott, 883 F.2d 551, 553-54 (7th Cir.1989) (quoting Harlow, 457 U.S. at 818, 102 S.Ct. at 2738). In Rakovich, this court has also stated that "under Harlow an objective immunity analysis at the summary judgment stage prior to discovery does not include an evaluation of intent. This is because evaluating intent would be a factual analysis, whereas the objective inquiry is a legal question." Rakovich, 850 F.2d at 1210 (emphasis in original). Such an interpretation is consistent with Harlow's approval of deciding qualified immunity cases by summary judgment because "[a]n objective analysis is less fact bound than a subjective analysis, making summary judgment a practical and effective means of terminating unnecessary litigation." Id. at 1205. "Thus ... a qualified immunity analysis entails a purely objective inquiry to determine whether at the time of the alleged illegal act, the right asserted by the plaintiff was clearly established in the particular factual context presented." Polenz, 883 F.2d at 554 (citing Cleveland-Perdue v. Brutsche, 881 F.2d 427 (7th Cir.1989)), petition for cert. filed, 58 U.S.L.W. 3491 (U.S. Jan. 24, 1990). It is with such an objective approach in mind that we review this case.
 
 
 7
 In light of Harlow, however, we note that the Supreme Court has not yet fully explored a court's inquiry in applying an objective analysis to a claim that depends on the official's state of mind. See Benson v. Allphin, 786 F.2d 268, 276 n. 19 (7th Cir.1986), cert. denied, 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986). This case presents such a dilemma, because alleged racial discrimination, violation of civil rights, and retaliation all inherently involve the intent of an official to discriminate. This court, however, has developed an analysis for the proper inquiry to be undertaken. We have cautioned:
 
 
 8
 It is a mistake to read Harlow too broadly. The elimination of intent from the formula does not mean that the Harlow Court sought to limit civil rights actions to those where state of mind was not a part of the substantive law. Harlow merely states that intent must not be evaluated or weighed through a factual inquiry, which would reduce the likelihood that qualified immunity could be decided in a motion for summary judgment.
 
 
 9
 Rakovich, 850 F.2d at 1210 (citations omitted and emphasis in original). Therefore, despite the apparent Harlow paradox, an objective analysis is applicable to situations involving a public official's state of mind. The objective determination in these cases requires that courts not consider intent when making the final determination at summary judgment of whether the law is clearly established.
 
 
 10
 We are more explicitly guided in applying the objective standard to this case by the approach taken in Wade v. Hegner, 804 F.2d 67 (7th Cir.1986). In Wade, we held that Harlow calls for the district court to conduct a two-part analysis when state of mind is at issue: "(1) Does the alleged conduct set out a constitutional violation? and (2) Were the constitutional standards clearly established at the time in question? ... Intent is relevant to (1) but not to (2)." Id. at 70. Thus, when intent is crucial to a party's claim, as it is in this case, the court's consideration of intent is relevant to the determination of whether a constitutional violation exists but not in deciding if the constitutional standard was clearly established. We stated in Polenz in applying Wade that
 
 
 11
 where a particular state of mind (e.g., intent, discriminatory motive, retaliatory motive) is an element of the alleged constitutional violation, and the qualified immunity issue arises at the summary judgment or directed verdict stage, in order to answer the step one inquiry, the court must determine whether the plaintiff has factually supported the allegations as to the state of mind element. We made clear, however, that the defendant's subjective state of mind is not relevant to the determination of question two.
 
 
 12
 Polenz, 883 F.2d at 554 (footnotes omitted).
 
 
 13
 In Halperin v. Kissinger, 807 F.2d 180 (D.C.Cir.1986), Justice Scalia, just after his elevation to the Supreme Court, addressed this subject of intent in the national security context. He fully discussed the situation when clearly established law makes the act legal or illegal depending upon the intent with which the act was performed. 807 F.2d at 184. We read Halperin as being in general agreement with our later case in Wade. See also Martin v. D.C. Metro. Police Dep't, 812 F.2d 1425, 1433 (where intent is an element of the alleged constitutional offense, the plaintiff must be allowed opportunity to offer proof of defendant's illicit motive), vacated in part, 817 F.2d 144, original opinion reinstated, 824 F.2d 1240 (D.C.Cir.1987). In the present case, we are past some of the problems discussed in Halperin, because this case had progressed to the point of being set and ready for trial before Rice raised the qualified immunity issue. Defendants, so far as the first prong of Wade is concerned, concede in their brief, assuming the truth of the allegations, that the district court was arguably correct in concluding that the plaintiffs sufficiently alleged a constitutional violation based on racial animus. We are left with the Wade second step of determining objectively whether that constitutional violation was clearly established at the time.
 
 
 14
 This circuit has addressed and attempted to clarify the ambiguities and difficulties in the qualified immunity analysis. Having thus examined the relevant legal principles, we now consider Rice's claim to qualified immunity under each of the remaining counts. This court is not divided by what the law is believed to be, but only by the law's application in the circumstances of this case.
 
 III.
 
 15
 We begin by considering Rice's entitlement to qualified immunity under the plaintiffs' race discrimination claim, count III. It is alleged that the plaintiffs were excellent officers and previously had not been the subject of any complaint or disciplinary action, but to the contrary, all plaintiffs had received numerous awards and commendations from the police department and the city of Chicago. At the time this reorganization was undertaken, Rice advised plaintiffs they had done excellent jobs, served well, and that there were no criticisms. No explanation, however, was given to plaintiffs by Rice for his actions. Plaintiffs allege, however, that race was the unspoken explanation, all in accordance with a plan between the late Mayor Washington and Rice to harass and demote these white officers to make their positions available to black officers.
 
 
 16
 Almost five years after the case had been instituted and not long before trial was scheduled, Rice belatedly raised his qualified immunity defense by motion for summary judgment. At the argument on Rice's summary judgment motion, the district judge over a two-day period thoroughly explored the immunity issue with counsel. Considering that the trial was scheduled to begin, the district judge orally ruled from the bench denying summary judgment to Rice on the basis of qualified immunity. The district judge noted that a reasonable superintendent who in determining whether the contemplated reorganization was legal would have had to take into account something that Rice claims he did not, and that was race. During the argument, Rice's counsel argued that Rice was being "truthful, not cagey," when he said he did not take race into consideration. There was then a short general discussion about possible perjury, but the district judge necessarily came to no conclusion whether Rice was being truthful in his denial of racial consideration. Plaintiffs maintained that because Rice denied race was a factor and did not raise an affirmative action defense, he was precluded from relying on the state of affirmative action law to determine if a constitutional violation was clearly established and thereby creating a qualified immunity defense.
 
 
 17
 The district judge explained that he was considering the allegations of the complaint, looking at the constitutional right specifically alleged as having been violated and looking to "the reasonableness of the action, as to whether a reasonable public official would have known, based upon the law as established at that time, whether the action taken as alleged in the complaint violated a clearly established constitutional right." He concluded that it was clearly established based upon objective criteria, that a public official could not use race for making employment determinations and therefore denied qualified immunity. The ruling of the district court cannot fairly be characterized as based only upon Rice's subjective intent or state of mind, but it appears to be based upon the law applied to the facts alleged and known at that stage of the proceeding. There was admittedly no evidence of any affirmative action plan: no racial analysis had been done, and no affirmative action purpose in any degree was claimed. Faced with these objective facts about the white demotions and black promotions outside any affirmative action context and quite apart from Rice's subjective intent, there was no basis for the district court to proceed to consider the state of affirmative action law.
 
 
 18
 There is no disagreement in this court that the Wade interpretation of Harlow is to be applied. It is agreed that intent is crucial to a plaintiff's claim but relevant only in determining whether a constitutional violation exists under part one of the Wade approach. Nor is there disagreement in this court that plaintiffs sufficiently alleged a constitutional violation in their demotions based on racial animus considering at this stage that plaintiffs' allegations are true. The application of the Wade step 2, however, is where the court divides, not on the law but in its application to this case. It is accepted that consideration of intent is not relevant in determining if the constitutional standard allegedly breached was clearly established.
 
 
 19
 We must be careful to properly characterize with particularity the right in question. In Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Court defined the necessary specificity to be considered in determining the particular constitutional right, emphasizing that the identification of clearly established right is not to be determined in broad terms. Id. at 639, 107 S.Ct. at 3038; see also Cygnar v. City of Chicago, 865 F.2d 827, 843-44 (7th Cir.1989). The Anderson Court was concerned that by merely pleading a violation of an extremely abstract constitutional right plaintiffs could easily get into court, proceed to trial, and thwart the good intentions of qualified immunity. Davis v. Scherer, 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984). "It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640, 107 S.Ct. at 3039. Only by defining the right in these terms will a court properly address the major concerns of Harlow.
 
 
 20
 This court disagrees among itself about whether plaintiffs' allegations that they, high-ranking white officers who were demoted without any just cause or complaint about their professional performance but only because of race so as to make their police supervisory command positions available to be filled by black officers, violated the equal protection clause of the Constitution, and in particular 42 U.S.C. Secs. 1981 and 1983. We do not view those allegations to be so general as to run afoul of Anderson on the grounds that they do not provide a sufficient basis for a reasonable official to understand what he was doing violates that right. The test for immunity is whether the law is clear in relation to the specific facts confronting the public official when he acted. Rakovich v. Wade, 850 F.2d 1180, 1209 (7th Cir.) (en banc ), cert. denied, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988). "[E]ach of the federal courts of appeals [has] implied that the defendant's knowledge is to be measured against that of the reasonable person in her circumstances, or the reasonable police officer/prison warden/teacher, etc." Kinports, Qualified Immunity in Section 1983 Cases: The Unanswered Questions, 23 GA.L.REV. 597, 618 (1989). In general terms what we have in this case is whether a reasonable police chief of a large metropolitan police force should be able to understand that he could not substitute on a wholesale basis black for white officers in high command positions without some fair cause or reason and certainly not on the basis of racial animus. It is not expecting too much from a reasonable superintendent of police to come to the conclusion that the kind of alleged racial discriminatory action charged here, whether black or white, has not just recently been found to be unsupportable.
 
 
 21
 It is in effect conceded that race discrimination for race's sake is not to be tolerated in government employment. Writing for himself in a case in which no single justice spoke for the court, Regents of the University of California v. Bakke, 438 U.S. 265, 289-90, 98 S.Ct. 2733, 2747-48, 57 L.Ed.2d 750 (1978), Justice Powell wrote in general that "[t]he guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color. If both are not accorded the same protection, then it is not equal." Justice Powell, however, agreed with other members of the court that race could be taken into account in the school admission context depending on affirmative action factors. That, in part, explains why the defense in the present case attempts to turn to affirmative action law. There was, however, absolutely no foundation in fact for any affirmative action defense, and none was directly claimed. Whether qualified immunity can be invoked on an affirmative action concept is therefore the issue.
 
 
 22
 We are urged by Rice to eliminate his subjective intent, whatever in fact it was, from the qualified immunity analysis and consider the state of affirmative action law in 1983, granting qualified immunity on that basis regardless of the absence of any factual basis. There is no claim that there was in existence on an objective, even on a subjective basis, any sort of an affirmative action plan or purpose whatsoever that might have led a reasonable superintendent to believe he was therefore doing something proper, not improper. Anderson required only that the contours of the right be sufficiently clear that a reasonable official would understand that what he is doing violates that right. 483 U.S. at 640, 107 S.Ct. at 3039. The Court then explained the limits on that requirement. Qualified immunity does not protect official action just because the very action in question has not previously been held unlawful. It is only required that in the light of preexisting law the unlawfulness of the action is apparent.
 
 
 23
 Our case, Cygnar v. City of Chicago, 865 F.2d 827 (7th Cir.1989) does not lend itself to application in the present case so as to totally fictionalize the creation of qualified immunity for Rice. Cygnar is not a ticket to the land of make-believe. To go beyond the facts of Cygnar and spread its reasoning over entirely different circumstances makes a fool of the law. Cygnar likewise involved white and black police officers in the City of Chicago Office of Municipal Investigation ("OMI"). When former Chicago Mayor Harold Washington appointed a new director of that agency, the new director quickly conducted a survey of the gender and race of the office staff and reported by memo to his superior on the racial makeup. He advised that "affirmative action concepts do not exist in this department." He further advised that due to constraints on civil career service staff personnel to resolve that imbalance could only be a long-range goal, but as to the police personnel it would be dealt with immediately, and it was. A majority of those who replaced the demoted white officers were black. Rice, also a defendant in the Cygnar case, has had his share of legal problems involving race. The supervisor in Cygnar denied racial or discriminatory animus and claimed only that he acted out of a legitimate desire to "bring in his own people." 865 F.2d at 832. However, as a further defense, although an inconsistent one, it was claimed that the supervisor was in good faith attempting to institute an affirmative action plan. This court held the affirmative action defense failed because the city proffered no evidence of past discrimination or statistical comparison establishing a manifest imbalance between the relevant area labor pool of officers qualified to perform sensitive investigations of city corruption, and the present personnel of the agency. The court went on to hold, 865 F.2d at 844, that although the supervisor's conduct may well violate today's constitutional law standards, that there was no case law at the time clearly preventing the supervisor from trying to correct what he perceived to be a statistical under-representation of minorities in his office. We therefore held that the supervisor was entitled to qualified immunity on plaintiff officers' racial discrimination claims.
 
 
 24
 In Cygnar, in contrast to the present case, there was something factually to build on: there appears to have been an embryonic affirmative action plan or purpose even though deficient. But in this present case there is absolutely no evidence factually supportive of an affirmative purpose. The Cygnar facts do not exist because Rice has made it very plain there was no affirmative action rationale. The reorganization was not approached on that basis. There is therefore no evidence or claim of any affirmative action statistical analysis, or of past discrimination, or anything else for affirmative action purposes. In fact, Rice explained that if he had injected race and any factors other than efficiency and effectiveness into the top command structure, he would have been doomed to failure as a superintendent. In these circumstances based on the facts of what happened, leaving to one side Rice's subjective intent, there is nothing, except judicial air, upon which to construct for Rice what would be a species of a nonexistent affirmative action for qualified immunity purposes.
 
 
 25
 We do not see how the correct portrayal of the specific right alleged to have been violated involving race can be correctly characterized, as this court's now-vacated opinion characterized it, as whether a reasonable superintendent of police could have concluded that he could take race into consideration for a limited reorganization of the exempt ranks of the police department. That formulation does not bear an accurate "relationship to the 'objective legal reasonableness' that is the touchstone of Harlow." Anderson, 483 U.S. at 639, 107 S.Ct. at 3038. That formulation, it has been argued, does not preclude the court from considering the state of affirmative action law merely because Rice lacked the subjective intent to implement an affirmative action plan. There is more in the present case than just "taking race into consideration." That formulation of the right does not fit this case although it might fit others.
 
 
 26
 We believe the issue can be more particularly stated to fit the facts and circumstances of this case as required by Anderson. The issue as we see it is "whether in 1983 a reasonable superintendent of a major metropolitan police force could have reasonably concluded that he could reorganize the police department's highest level managers by reassigning or demoting twenty-five white officers from the exempt ranks but demoting no black officers, and then promoting thirteen black officers into the new vacancies created by the white demotions, all in the total absence of any affirmative action concept or criteria, defective or otherwise."[3]
 
 
 27
 Race is and has been for a long time a very sensitive issue in this country. No reasonable police chief could have objectively and reasonably concluded that he could do on a wholesale basis what Rice did and not thereby violate the rights of the white officers. Any police chief who thought he could demote and promote only along allegedly clear racial lines could not be a reasonable police chief. Even Rice acknowledged that if he had injected race into the reorganization he would be doomed to failure as a superintendent. What in fact happened is another matter. The case now goes to a jury so that it can decide whether the plaintiffs' allegations are true.
 
 IV.
 
 28
 We turn next to plaintiffs' allegations that Rice's actions violated their civil rights under 42 U.S.C. Sec. 1985(3).[4] The district court also denied Rice qualified immunity on count IV.
 
 
 29
 In analyzing this count, we must apply the same qualified immunity analysis as previously discussed. We again use the same inquiry as framed above to determine if a reasonable superintendent of police of a large metropolitan force should have clearly known that what he did would violate the rights of plaintiffs. The pivotal question under 42 U.S.C. Sec. 1985(3) is whether it was clearly established in 1983 that whites as a class came within the protection of the statute. If not, Rice is entitled to qualified immunity on this particular charge. So far as the conspiracy requirement is concerned, it is alleged that the demotions of the white officers for the benefit of black officers were part of a plan and agreement between former Mayor Washington, Rice, and other black city employees. The district court concluded its consideration of this count by holding that a public official in Rice's position in 1983 could not reasonably believe that 42 U.S.C. Sec. 1985(3) was only to protect blacks, not whites, from racial discrimination.
 
 
 30
 Rice argues that the qualified immunity he claims to be entitled to under count III applies to count IV, "[b]ecause it was not clearly established that [Rice's] acts violated the equal protection clause, a fortiori it was not clearly established that a conspiracy to commit those acts was illegal." Because we have found Rice not entitled to qualified immunity under count III we might also a fortiori find he was not entitled to it under count IV, but the considerations are not the same.
 
 
 31
 The district judge's view of section 1985(3) is not without foundation. A mere reading of section 1985(3), as adopted in 1871 following the Civil War, does not suggest that it does not mean what it plainly says on its face. Its language extends protections to "any person or class of persons" and to "citizens" without evident distinction, racial or otherwise. It does not mention black or white or reveal on its face that some are entitled and some are not to "equal protection of the laws, or of equal privileges and immunities under the laws." There is also some legislative history that can be selectively extracted which suggests a literal reading of the statutory language is what Congress intended. Representative Rainey, for instance, expressed the desire that the act be construed to protect the humblest citizens without regard to rank, creed, or color. CONG. GLOBE, 42d Cong., 1st Sess. 395 (1871).[5] Representative Buckley expressed his view that the legislation was not to protect "colored only, but the whites also." Id. at 190. Senator Edmunds also gave the statute a very expansive view. Id. at 567. Recently, we considered the racial application of section 1985(3) and found that without doubt it covered conspiracies against whites, not just blacks. Triad Assocs., Inc. v. Chicago Housing Auth., 892 F.2d 583, 591-93 (7th Cir.1989). We need not review here Triad's cogent discussion of the issue. A clear signal in the fourteenth amendment context, though not precedential in this statutory interpretation, came from Regents of the University of California v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). Both section 1985(3) and the fourteenth amendment provide for "equal protection" of the laws. Justice Powell in Bakke, 438 U.S. at 289-90, 98 S.Ct. at 2747-48, wrote that "[t]he guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color." After that well-publicized decision in 1978, it could be argued no reasonable chief of police could have an objectively reasonable belief that "equal protection" used in one place would mean less when used in another. Our decision in Triad should therefore not have come as a surprise. We noted, however, in Triad, that the Supreme Court has never held that the statutory language of section 1985(3) was to protect other than blacks. Even without Triad, it could be argued that no one could reasonably have believed that the wholesale racial demotions and promotions of public officers as alleged here could be countenanced under the Constitution and the laws of this country, absent an affirmative action effort. That Triad comes only in 1989 could possibly be explained that it is simply because only in recent years have blacks gained a rightful share of political power, which can give rise to abuses, whether by black or white. But things are not so simply to be resolved.
 
 
 32
 In July 1983, the critical year in the present case, the Supreme Court said, "it is a close question whether Sec. 1985(3) was intended to reach any class-based animus other than animus against Negroes, and those who championed their cause...." United Bhd. of Carpenters, Local 610 v. Scott, 463 U.S. 825, 836, 103 S.Ct. 3352, 3360, 77 L.Ed.2d 1049 (1983). It was the "predominant purpose" of the statute, the Court continued "to combat the prevalent animus against Negroes and their supporters." Id. One scholar in 1987 summed up the section 1985(3) situation:
 
 
 33
 Even after one hundred and sixteen years, four major Supreme Court opinions, colorful legislative history, and over five hundred lower court opinions, there is probably no other federal statute in such complete disarray, distortion, and confusion as that section of the Civil Rights Act of 1871 now codified at 42 U.S.C. Sec. 1985(3).
 
 
 34
 McDonald, Starting from Scratch: A Revisionist View of 42 U.S.C. Sec. 1985(3) and Class-Based Animus, 19 CONN.L.REV. 471, 471 (1987) (footnote omitted).
 
 
 35
 Although scholars, lawyers, and judges have not yet resolved all the problems with section 1985(3), including some not pertinent to this case, it is possible that a reasonable police chief could have. But in any event it cannot be said that the law was clearly established in 1983. Rice is entitled to qualified immunity on count IV, thus requiring reversal on that count.
 
 V.
 
 36
 Turning to Rice's final claim, we review the district court's partial denial of qualified immunity on plaintiffs' cause of action alleging in count V a "pattern of harassment and retaliatory treatment by defendant Rice" since the filing of this complaint. Specifically, plaintiffs allege that Rice engaged in conduct that consisted of retaliatory transfers and a failure to consider plaintiffs for promotions in violation of their first amendment right to freedom of speech that protects their right to file this suit. The district court granted summary judgment on the basis of qualified immunity for all acts that occurred on or before June 11, 1984, the date this Court denied rehearing in Altman v. Hurst, 734 F.2d 1240 (7th Cir.), cert. denied, 469 U.S. 982, 105 S.Ct. 385, 83 L.Ed.2d 320 (1984). In Altman, a police sergeant was reassigned to a less-desirable post after the police chief suspected that the sergeant encouraged another officer to appeal her suspension from the force. After the sergeant filed his complaint, a campaign of harassment was instituted against him. We held that the filing of the sergeant's suit and subsequent retaliation by the police chief were not in violation of plaintiff's first amendment rights because the speech concerned only a private matter rather than issues of public concern. Altman, 734 F.2d at 1243-44.
 
 
 37
 The district court read Altman to clearly establish, however, that a lawsuit raising a matter of public concern, not merely a private matter as in Altman, was therefore speech protected by the first amendment and entitled to protection under section 1985(3). Further findings by the district court determined plaintiffs' suit inherently involved a matter of public concern because it involved the superintendent of police. Accordingly, the district court denied Rice qualified immunity for acts after June 11, 1984. Rice claims he is entitled to qualified immunity for acts alleged to have occurred after June 11, 1984, as well, because he alleges that in 1984-1985 it was not clearly established that the first amendment prohibited retaliation for filing a civil rights lawsuit.
 
 
 38
 There is no disagreement in this court that the demotions and promotions alleged are of "public interest," but there is disagreement over whether the filing of this suit qualifies under Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), as a matter of "public concern," not merely public interest, and is therefore entitled to first amendment protection. In Connick a staff employee, disgruntled about a proposed transfer, circulated to other employees within that office a questionnaire seeking their views on internal office affairs. The employee was promptly discharged for being insubordinate and causing office disruption. The Court held there was no first amendment protection for the employee's questionnaire as it was no more than an employee grievance circulated internally and concerning only internal office policy. In Connick, the Court noted that the employee did not seek to bring to light any wrongdoing or breach of public trust, and even if the questionnaire had been publicly distributed it would convey no more than the fact that a single employee was upset. Id. at 148, 103 S.Ct. at 1690. First amendment protection was not extended because the employee's speech did not substantially involve matters of public concern. For the Court to have interfered in those circumstances would have been merely to involve itself in office management, which it declined to do. It was explained that because of the enormous variety of fact situations in which these issues might arise it was not feasible to attempt to lay down a general standard to be applied to all situations. Id. at 154, 103 S.Ct. at 1693 (quoting Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). In each situation the time, place, and manner of the affected speech would be relevant, the court said. Id. at 152, 103 S.Ct. at 1692.
 
 
 39
 In Yatvin v. Madison Metropolitan School District, 840 F.2d 412 (7th Cir.1988), the plaintiff sought a position with the school district but was not chosen. She then filed sex discrimination charges, applied for another position with the school district, but again was not chosen. This second failure gave rise to her suit claiming retaliation in violation of her first amendment rights for having filed the sex discrimination charges. This court characterized it as "the run-of-the-mine single-plaintiff lawsuit" in which plaintiff sought only her own promotion. No relief was sought against pervasive or systemic misconduct by public officials. Relief was denied. Id. at 420. The present case is, however, no "run-of-the-mine single-plaintiff discrimination case," but one of potentially broad impact not only upon the multiple plaintiffs but also upon the public's welfare and safety. In this case the filing of this lawsuit in federal court cannot fairly be characterized as merely these plaintiffs speaking out only about a matter of personal interest. The fact that the plaintiffs also sought damages for alleged wrongs is not enough to keep Rice's actions from being a matter of public concern. If that be the test, only one not aggrieved could raise a protected matter of public concern, and even the few would-be plaintiffs that could meet this test might find the courthouse door blocked by principles of standing. Even if the plaintiffs themselves viewed their problems as only a personal matter, the test of public concern is more objective. It does not depend entirely on the fact the plaintiffs filed a suit for damages and would benefit but also on the other factors discussed in Connick.
 
 
 40
 It would be difficult to find a matter of greater public concern in a large metropolitan area than police protection and public safety. When there is a wholesale change in the highest police echelons allegedly only on a racial basis and not on merit, whether black for white, or white for black, there cannot but be, and there should be genuine public concern. There was clearly public interest. The reorganization was front page news in the Chicago Tribune on December 3, 1983. It must also be a matter of public concern if a group of public employees is allegedly harassed and penalized by supervisors for seeking redress in our federal court system because of their public objection to the alleged racial basis of the reorganization. That would be intolerable even for claims later found to be without merit.
 
 
 41
 We do not know what the merit of plaintiffs' count V allegations may turn out to be, but that should be decided at trial and not foreclosed by the unjustified grant of qualified immunity to excuse the alleged wrong. Summary judgment for Rice was unwarranted on count V.
 
 
 42
 The judgment is affirmed on counts III and V. The parties shall bear their own costs. Circuit Rule 36 shall not apply.
 
 
 43
 BAUER, Chief Judge, dissenting.
 
 
 44
 I join Judge Flaum's dissent and write only to suggest that the analysis in Judge Cudahy's dissent does not represent my view of the matter. The dimensions of the problem which my Brother Cudahy thinks may have escaped the attention of the majority and minority on the issue are ones I frankly prefer to miss. I do not believe that a recognition of a "white" or "black" party by a judicial decision is necessary, nor do I think that it is true.
 
 
 45
 I think it unfortunate that voting proceeds along racial lines all too frequently, but voting has frequently been based on ethnic appeals; I don't doubt that people have voted for Irish candidates, Italian candidates and German or Polish candidates just because of that national identity (or voted against such candidates for the same reason). But that has not prompted the courts or law to recognize an "Irish" party or "Polish" party and designate one or the other as the winner or loser and ascribe the party patronage policy to be based on the ethnic identity of the winner.
 
 
 46
 The candidates were all members of organized and recognized political parties; indeed, the successful candidates for mayor, black and white, were all members of exactly the same party.
 
 CUDAHY, Circuit Judge, dissenting:
 
 47
 I join Judge Flaum's dissent on the race discrimination issue but I write separately both to comment further on affirmative action and to note other dimensions of the problem which were not raised by the parties but which seem clearly relevant.
 
 
 48
 This is certainly not an ordinary case of affirmative action. It is not, at least from all appearances, the frequently encountered case of a government (usually white-dominated) instituting measures that benefit minorities in order to remedy past discrimination. But, even assuming that the case presents a real, if unusual, case of affirmative action, Chief Rice did nothing that was clearly unconstitutional given the case law of 1983. Indeed, the state of affirmative action law has been notoriously unclear and in flux throughout the evolution of the doctrine. In the early 1980s, affirmative action law was still really in its infancy. (The first full blown affirmative action case decided by the Supreme Court was the Bakke decision handed down in 1978.)
 
 
 49
 In 1980, for example, the Supreme Court held that the government could use appropriately tailored race-conscious measures to counter the effects of past discrimination. Fullilove v. Klutznick, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). And, as late as 1986, the Supreme Court held that public employers may sometimes embark upon a race-conscious scheme for remedying past employment discrimination. Wygant v. Jackson Board of Education, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). Our own case law has been consistent with these Supreme Court dictates. Cygnar v. City of Chicago, 865 F.2d 827 (7th Cir.1989) (citing to Lehman v. Yellow Freight System, Inc., 651 F.2d 520 (7th Cir.1981)). Hence, a reasonable governmental actor could have taken lawful race-conscious measures in 1983. At least, when viewed as affirmative action, what Chief Rice did was not clearly unconstitutional at the time he acted.
 
 
 50
 However, I would prefer to try to analyze this situation as something other than a case of affirmative action. Rice denied that he was engaging in affirmative action and the facts do not really fit that mold. This seems to me instead to be very much a political case cast in a racial mold. The 1983 election resulting in the election of Mayor Washington was fought to an extraordinary extent along racial lines, but it was an election nonetheless. Indeed, the political alignment was coterminous with race to a degree having few parallels in electoral history.
 
 
 51
 " 'Except for the accidents,' " in the words of an involved political consultant, "Washington got all of the black vote." Kleppner, Chicago Divided: The Making of a Black Mayor 217 (1985). In fact, in the 1983 general election for mayor, Harold Washington received, according to some estimates, approximately 99% of the black vote and only 12 to 16% of the white vote, with the Hispanic vote split. Id. at 218 (Table 23); Levinsohn, Harold Washington: A Political Biography 270 (1983). In effect, the blacks won the 1983 election and the whites lost.
 
 
 52
 The 1983 election was not a traditional Chicago election.
 
 
 53
 "It used to be that ... many people would have chosen sides according to party, and the campaign would be over," [Patrick] Caddell [a political expert] observed shortly before election day. "This time, people also have chosen sides, but the controlling fulcrum here is race not party."
 
 
 54
 Kleppner, Chicago Divided at 236.
 
 
 55
 The Police Department itself apparently played a significant role in the 1983 mayoral election:
 
 
 56
 In the eight days before the April 12th general election, the mayoral race was shaping into a photo finish. In an effort to push Epton [the Republican candidate] over the finish line ahead of Washington, Police Supt. Richard Brzeczek announced his resignation on Tuesday, April 5, exactly one week before the big day. Brzeczek, who had campaigned for [former Mayor] Byrne in the primary, once warned the citizens of Chicago that the streets would not be safe under a Washington administration. The faint of heart were being led to believe that Chicago would become a 20th century Wild West Dodge City under a Black mayor. White police officers, among whom Epton had a great deal of support, expressed regret and anger at Brzeczek's departure. Black officers considered his resignation as a step forward.
 
 
 57
 Travis, "Harold": The People's Mayor 194 (1989). It is in this context of a supercharged political contest waged along starkly racial lines that we must view the controversy before us--not as some sort of sanitized exercise in racial balance.[1]
 
 
 58
 In this case, Rice, a member of the winning (black) party[2] reorganized his department according to the classic dictates of politics to place more members of the prevailing party in policymaking positions. Since these were upper-rank policy positions the reorganization would not be illegal presumably even under Rutan v. Republican Party of Illinois, --- U.S. ----, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). Indeed, the district court held Rice to be qualifiedly immune from suit on the claim that the white officers were demoted for "political reasons." The district court reasoned that, under the circumstances, it was "not a constitutional violation to make employment decisions based upon political affiliations when party affiliation is an appropriate requirement for effective performance of the public office involved." This ruling has not been appealed. If this is a political case for one purpose, I believe it should be regarded as a political case for other purposes--including equal protection.
 
 
 59
 In addition, it should be noted that a violation of the equal protection guarantee requires an intent to discriminate against a particular group--in this case whites. See Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). There seems to me no such intent on the facts before us. The Supreme Court has held that an intent to discriminate must be a "motivating factor" of the challenged action. Hunter v. Underwood, 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985). The line that prefers blacks and discriminates against whites is so fine that it may be argued with some force that an "intent to discriminate" is not evident here. Rice evidently did not desire to hurt whites; he merely intended to recognize and reward those who had worked, or at least voted, for the victor (and who were "philosophically" compatible with Washington and Rice). Moreover, there is no evidence in the record of any specific "racial animus" involving a desire on Rice's part to demean whites as such. Because this is really a political case and because Rice, in order to benefit members of the "black" party, had--by definition--to take actions that adversely affected whites, I cannot find the requisite discriminatory intent here. In short, Rice acted, not because he wanted to hurt whites, but "in spite of" the fact that he was hurting whites. See Personnel Administrator of Mass. v. Feeney, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979).[3]
 
 
 60
 On the basis of this "political" equal protection analysis, which seems to me considerably more realistic than a conventional affirmative action one, Rice either would be arguably innocent of a civil rights infraction or would have qualified immunity since promotions among policymaking officials after a "black" party political victory did not constitute a clearly established constitutional violation in 1983.
 
 
 61
 FLAUM, Circuit Judge, with whom BAUER, Chief Judge, CUDAHY, and KANNE, Circuit Judges, join, dissenting.
 
 
 62
 I respectfully dissent from the majority's decision because I believe it is contrary to the Supreme Court's statement that "bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery." Harlow v. Fitzgerald, 457 U.S. 800, 817-18, 102 S.Ct. 2727, 2737-38, 73 L.Ed.2d 396 (1982). As the majority correctly notes, this Court is not divided on the law of qualified immunity, but rather on its application when the defendant government official's state of mind is at issue. Specifically, I differ on whether the court should consider the alleged underlying state of mind to determine if there is a clearly established right. The majority injects intent into this analysis, while I believe intent should not be considered in objectively defining the relevant body of law. See Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (qualified immunity to be applied objectively); Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (objective qualified immunity analysis proper for summary judgment); Polenz v. Parrott, 883 F.2d 551, 553-54 (7th Cir.1989) ("Supreme Court eliminated the subjective good faith element from the qualified immunity analysis"); Cleveland-Perdue v. Brutsche, 881 F.2d 427 (7th Cir.1989) (qualified immunity analysis entails a purely objective inquiry), petition for cert. filed, 58 U.S.L.W. 3491 (U.S. Jan. 24, 1990); Wade v. Hegner, 804 F.2d 67 (7th Cir.1986) (intent not relevant to whether constitutional standards clearly established). For the reasons discussed below, I respectfully dissent as to Counts III, race discrimination, and V, retaliation. I concur with the majority's opinion on Count IV, conspiracy.I.
 
 
 63
 My first disagreement concerns the majority's denial of qualified immunity on Count III, the race discrimination claim. Although the majority correctly notes Harlow's directive that an objective analysis, one eliminating subjective intent, must be applied in determining whether the constitutional violation was clearly established, it overlooks the ruling in its application of the law to this case. The Harlow Court stated that it "was instituting a new regime of 'reliance on the objective reasonableness of an official's conduct' ... and that it was generally eliminating '[j]udicial inquiry into subjective motivation.' " Halperin v. Kissinger, 807 F.2d 180, 185 (D.C.Cir.1986) (Scalia, J.) (quoting Harlow, 457 U.S. at 817, 102 S.Ct. at 2737). The Court later confirmed that Harlow "purged qualified immunity doctrine of its subjective components." Halperin, 807 F.2d at 185 (quoting Mitchell v. Forsyth, 472 U.S. 511, 517, 105 S.Ct. 2806, 2810, 86 L.Ed.2d 411 (1985)). I fail to see how the majority's application takes these concerns into account.
 
 
 64
 My approach differs from that of the majority because I believe the right should be defined without considering intent. As the Supreme Court held in Anderson, 483 U.S. at 641, 107 S.Ct. at 3039, inquiry into an official's subjective intent is not part of the Harlow qualified immunity analysis. The majority's characterization of the right at issue incorporates the plaintiffs' bare allegations of malice and thus sacrifices the "the 'objective legal reasonableness' that is the touchstone of Harlow." Anderson, 483 U.S. at 639, 107 S.Ct. at 3038. The majority's approach transforms qualified immunity into a simple rule of pleading, something the Supreme Court has warned against. Id. at 639, 107 S.Ct. at 3038. The right at issue, however, must be defined "in relation to the specific facts confronting the public official when he acted," Rakovich v. Wade, 850 F.2d 1180, 1209 (7th Cir.1988) (en banc ) (quoting Colaizzi v. Walker, 812 F.2d 304, 308 (7th Cir.1987)), not his underlying state of mind. Accordingly, "under Harlow, an objective immunity analysis at the summary judgment stage prior to discovery does not include an evaluation of intent." Rakovich, 850 F.2d at 1210.
 
 
 65
 To appropriately define the right in these terms, intent must be removed from the analysis. Therefore, I conclude the correct portrayal of the specific right alleged to have been violated involving race is whether a reasonable superintendent of police could have concluded that he could take race into consideration for a limited reorganization of the exempt ranks of the police department. This characterization of the right is more objective than that of the majority, as is required by Anderson. Accordingly, the court must consider all the law that the objective facts of the case support to determine whether the right is clearly established. In this context, an objective approach does not preclude a consideration of the state of affirmative action law merely because Rice may have lacked the subjective intent to implement an affirmative action plan.
 
 
 66
 The majority, in an attempt to demonstrate why the court should not consider affirmative action law, brings Rice's subjective intent into the analysis. Neither Harlow nor this Court's decision in Cygnar v. City of Chicago, 865 F.2d 827 (7th Cir.1989), supports the majority's approach. In Cygnar, this Court found that a City of Chicago department head charged with race discrimination for promoting blacks and demoting whites in a one-time reorganization was entitled to qualified immunity based on the state of affirmative action law, even though he denied using race as a factor in his decisions. In that decision, we found that the defendant's intent was not at issue, but rather the question was whether the law put him on notice that his actions violated clearly established constitutional rights. We concluded that only by defining the right at issue in an objective manner, through the elimination of intent, can such notice be achieved. The majority attempts to distinguish Cygnar on the ground that the district court in that case found the defendant was actually carrying out an affirmative action plan and cryptically testified to that effect, whereas in this case Rice strongly denies ever considering race. This distinction, however, is not as significant as one would be led to believe. In addition, any minimal factual distinction between the cases is irrelevant under the objective qualified immunity analysis established in Harlow. Under that approach, the government official's intent is not dispositive of the question of whether the law was clearly established at the time. See Anderson, 483 U.S. at 641, 107 S.Ct. at 3039 (Official's "subjective beliefs about [the action] are irrelevant").
 
 
 67
 By focusing the decision of this Court on whether Rice intended an affirmative action plan, the majority also is omitting Harlow's announced purpose of early elimination of insubstantial claims at summary judgment. In Rakovich v. Wade, 850 F.2d 1180, 1210 (7th Cir.1988) (en banc), we stated that "under Harlow, an objective immunity analysis at the summary judgment stage prior to discovery does not include an evaluation of intent. This is because evaluating intent would be a factual analysis, whereas the objective inquiry is a legal question." Rakovich, 850 F.2d at 1210. "An objective analysis is less fact bound than a subjective analysis, making summary judgment a practical and effective means of terminating unnecessary litigation." Id. at 1205. The majority's approach, however, thwarts this goal. It requires a court to consider intent, inevitably sending more, if not most, cases to trial. I, respectfully, disagree with this outcome. Rather, I believe a court should only look to the objective facts and determine whether the actions violate clearly established constitutional rights; if not, then qualified immunity should be granted. If Rice's actions in this case, therefore, can objectively reflect an affirmative action plan, then he should be entitled to qualified immunity. Intent should not be the controlling factor.
 
 
 68
 At the time in question, Rice's actions satisfied the requirements in Lehman v. Yellow Freight System, Inc., 651 F.2d 520 (7th Cir.1981), that "(1) some type of statistical disparity between the local labor force and the minority composition of the employer's work force and (2) a time limit on the plan" existed. Cygnar, 865 F.2d at 844 (citing Lehman). For these reasons, I would find that Rice's objective actions did not violate clearly established constitutional rights and would entitle him to a grant of qualified immunity at summary judgment.
 
 II.
 
 69
 I also disagree with the majority's denial of summary judgment for Rice on Count V, the retaliation claim. The threshold inquiry in such a case is to determine whether the matter is one of public, or private, concern. See Altman v. Hurst, 734 F.2d 1240 (7th Cir.1984). I differ with the majority's view that this is a matter of public concern.
 
 
 70
 The Supreme Court established the test in Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) to determine when an issue involves a matter of public concern. The Connick test does not look to what may be conveyed by the employee's speech, but rather requires a court to examine the reasons the employee is speaking.[1] The Court held the speech involved, distribution of a questionnaire, was motivated solely by a private purpose. In such circumstances, the Court stated, "when a public employee speaks not as a citizen upon matters only of public concern, but instead as an employee upon matters of only personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency." Connick, 461 U.S. at 147, 103 S.Ct. at 1690.
 
 
 71
 The mere fact that this case concerns a superintendent of police does not make this a matter of public concern. "To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark--and certainly every criticism directed at a public official--would plant the seed of a constitutional case." Connick, 461 U.S. at 149, 103 S.Ct. at 1691. Our decision in Altman recognized this principle when we determined that even though the case involved a chief of police, the allegations were still purely a matter of personal interest and not public concern.
 
 
 72
 In Linhart v. Glatfelter, 771 F.2d 1004, 1010 (7th Cir.1985), this Court established a list of questions to be considered in deciding this issue. These are: "was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?" Linhart, 771 F.2d at 1010. If the answers to these questions reveal that the dispute was purely a private matter, then the court should dismiss the claim. In Yatvin v. Madison Metropolitan School Dist., 840 F.2d 412, 419-20 (7th Cir.1988), we applied the Linhart questions and determined that the bringing of a lawsuit alleging retaliation for filing a sex discrimination complaint against a school district was not activity protected by the first amendment because the lawsuit was not a matter of public concern. The plaintiff in Yatvin, we determined, only "wanted to advance her career, not promote a cause." Id. at 419.
 
 
 73
 So, too, it is apparent in this case that the plaintiffs in filing their complaint were primarily challenging their demotions and transfers rather than trying to raise an issue of public concern. They sought to advance their careers and receive compensatory and punitive damages for the alleged wrongs. It was not their central intention to promote a cause of public concern. As was the case in Yatvin, the plaintiffs' action "does not seek relief against pervasive or systematic misconduct by a public agency or public officials, and, ... is not part of an overall effort by the plaintiff[s] ... to correct allegedly unlawful practices or bring them to public attention." Yatvin, 840 F.2d at 420 (emphasis added). Race discrimination is a matter of public concern, but the plaintiffs did not seek to debate race discrimination, they were solely interested in advancing their own private employment interests.
 
 III.
 
 74
 For the above stated reasons, I would reverse the district court's denial of summary judgment on Counts III and V. I concur with the majority's opinion on Count IV.
 
 
 
 [1]
 Portions of this opinion have been adapted from the original panel opinion, with Judge Flaum's very kind permission even though he disagrees with the results reached in parts III and V
 
 
 [2]
 Not all the affected white officers joined in this suit
 
 
 [3]
 It is too late on appeal to supply figures of disparity in the exempt ranks, figures Rice did not have, use, or want
 
 
 [4]
 42 U.S.C. Sec. 1985(3) provides as follows:
 If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.
 
 
 [5]
 The Congressional Globe was the official record of the United States Congress from 1833-1873
 
 
 [1]
 Racist pamphlets involving the police set the tone:
 Handbills were circulated depicting a police insignia that read "Chicongo Po-lease." On the insignia in the center were a pair of lips, a watermelon slice, a can of beer, and a slab of ribs; and the written commentary on the side deprecatingly linked these to black heritage and traditions. Another piece of racist propaganda, displayed in some of the police stations in white areas, posed a series of questions emphasizing the danger that with a black mayor, Chicago would become another Gary, Indiana. (emphasis supplied). "No matter what anyone tells you, this election has come down to race," it warned. Readers were urged to "make the difference" by voting for Epton and to "make copies" of the handbill "and get the word around."
 Kleppner, Chicago Divided at 211-212.
 
 
 [2]
 Perhaps one should not call the contending organizations "parties"; perhaps "electoral vehicles" would be a more felicitous term. One of these survives even today in a perhaps attenuated form as the "Harold Washington Party." But I think it is generally better that we recognize electoral reality and apply a doctrine that might fit than turn a blind eye to reality in search of convenient conclusions
 
 
 [3]
 See also United Jewish Organizations of Williamsburgh, Inc. v. Carey, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) (where six justices indicated that it was significant that the legislature had not intended to injure white voters when it drew up reapportionment plans that benefited minorities)
 
 
 [1]
 Count V concerns whether the plaintiffs have stated a first amendment claim. It is appropriate to consider the plaintiffs' intent, not the government official's, to decide this question under Connick